278 N.J. Super. 227 (1994)
650 A.2d 1001
EDWARD GOSS, PLAINTIFF-RESPONDENT,
v.
AMERICAN CYANAMID, CO., CELOTEX, INDIVIDUALLY AND AS SUCCESSOR TO PHILIP CAREY CO., AND PHILIP CAREY MFG., CO.; MADSEN & HOWELL; BABCOCK & WILCOX; OWENS-CORNING FIBERGLASS; OWENS-ILLINOIS; EAGLE-PICHER INDUSTRIES, INC., AND CLEAVER BROOKS CO., DEFENDANTS, AND H.W. PORTER COMPANY AND PORTER HAYDEN CO., DEFENDANTS-APPELLANTS. THERESA PATULLO, AS EXECUTRIX OF THE ESTATE OF NICHOLAS PATULLO, AND THERESA PATULLO, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS,
v.
H.W. PORTER COMPANY; AND PORTER HAYDEN CO., DEFENDANTS-APPELLANTS, AND CELOTEX, INDIVIDUALLY AND AS SUCCESSOR TO PHILIP CAREY CO., AND PHILIP CAREY MFG., CO.; MADSEN & HOWELL; BABCOCK & WILCOX; OWENS-CORNING FIBERGLASS; AND OWENS-ILLINOIS, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1994.
Decided December 22, 1994.
*229 Before Judges MICHELS, STERN and KEEFE.
Alan Bart Grant argued the cause for appellant Porter Hayden Company (McCarter & English and Ozzard, Wharton, attorneys; Andrew T. Berry, Michael A. Tanenbaum and Mr. Grant, of counsel; John C. Garde and Debra M. Perry, on the brief).
*230 Ronald B. Grayzel argued the cause for respondents Edward Goss and Theresa Patullo, Executrix of the Estate of Nicholas Patullo and Theresa Patullo, individually (Levinson, Axelrod, Wheaton and Grayzel, attorneys; Mr. Grayzel, of counsel and Pamela J. Collins Longhi, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendant Porter Hayden Company (Porter Hayden) appeals from a judgment of the Law Division entered on a molded jury verdict that awarded plaintiffs Edward Goss (Goss) and Theresa Patullo individually and as executrix of the Estate of Nicholas Patullo, deceased, damages in these consolidated personal injury, wrongful death and survivorship tort actions.
Goss and Nicholas Patullo (Patullo) claimed that they were exposed to asbestos-containing industrial products manufactured by Johns-Manville and distributed and installed by Porter Hayden, during their employment by American Cyanamid Co. (American Cyanamid), and that they developed asbestos-related diseases as a result of such exposure. The proofs showed that Johns-Manville marketed its asbestos-containing insulation products through distributors. Some of the distributors, known as Insulation Contract Units ("ICUs"), warehoused and sold the asbestos-containing products and represented Johns-Manville in bidding on labor and materials. Porter Hayden, formerly known as H.W. Porter Company, was an ICU for Johns-Manville from 1927 until the 1960's. Porter Hayden distributed Johns-Manville products exclusively and was a major supplier of Johns-Manville products, including those containing asbestos, to American Cyanamid. One of Porter Hayden's managers, Theodore Mannell, conceded that some of the Johns-Manville products supplied to American Cyanamid by Porter Hayden contained asbestos and that he personally witnessed American Cyanamid employees cutting the asbestos-containing products from time to time. When the insulation was cut, the asbestos was released into the air as dust fragments. *231 Similarly, when the cement was poured into water, the asbestos dust was released into the air.
Porter Hayden was not the only distributor of Johns-Manville products. In the mid-1960's, Johns-Manville added the Wallace Company as an ICU for the New Jersey region. However, it is unclear from the record whether the Wallace Company distributed to American Cyanamid. Charles S. Woods Company, an insulation contractor and representative of Owens-Corning Fiberglass Company and a Porter Hayden competitor for insulation contract work, also bid on contract jobs at American Cyanamid between 1950 and 1965. During that time, Charles S. Woods Company sold between fifty and one hundred contracts to American Cyanamid. At times, the Charles S. Woods Company was required to use Johns-Manville materials at American Cyanamid, which it was required to purchase through Porter Hayden. Defendant Madsen & Howell, an industrial hardware supply company, also distributed packing and gasket material made from asbestos sheeting for Johns-Manville. Madsen & Howell distributed those Johns-Manville products to American Cyanamid from the late 1930's to the present.
Goss worked at American Cyanamid as a pump and departmental mechanic from 1945 until 1984. He repaired pumps, autoclaves and tanks, which at times required removing piping and installation of asbestos-containing insulation, asbestos block and asbestos cement. These materials produced asbestos dust when cut or prepared. Most of the asbestos-containing products that Goss used were supplied by Johns-Manville. Goss testified that he spent approximately thirty percent of his work time either applying or removing asbestos insulation. Additionally, he worked alongside other employees who were full-time insulators approximately thirty percent of the time, and spent between thirty and fifty percent of his time working with asbestos packing or asbestos gaskets. Goss also used asbestos sheeting manufactured by Johns-Manville once or twice per year. At various times, Goss also worked on the Babcock & Wilcox boilers which were covered *232 with insulation at American Cyanamid, and which involved repairing piping and changing the screens inside the boilers. After a day of working with asbestos products, Goss's clothes would be covered with white dust and at times he would have to use an air hose to blow the dust off.
During Goss' employment at American Cyanamid, the asbestos-containing products were not labeled with warnings, nor were any written instructions ever given to Goss advising him to take precautions when using asbestos products. American Cyanamid began to advise their employees to take precautions in the 1970's, and in 1971, Porter Hayden began placing health warnings on any asbestos-containing products it distributed.
The deposition of Patullo, who died from lung cancer prior to trial, was introduced into evidence at trial. Patullo was employed as a pipefitter's assistant at American Cyanamid for six months in 1948. Patullo returned to American Cyanamid in 1950 and remained employed there as a departmental mechanic until 1976 or 1978. During that time, Patullo installed and removed asbestos-containing pipe covering manufactured by Johns-Manville. When the pipe covering and other insulation materials were cut, a dust was produced which Patullo inhaled. Patullo also worked in the same areas as other pipe coverers while they were cutting and installing insulation, although his labor union contract prohibited him from installing pipe fitting if the job required more than fifteen feet of material.
During his employment at American Cyanamid, Patullo never noticed any health warnings on the packages of the asbestos-containing products. Written safety instructions were not issued to Patullo advising him to take precautions when using asbestos-containing products. Towards the end of Patullo's employment, American Cyanamid required that he wear a mask on the job.
Frank Brandt, who was also employed by American Cyanamid from 1936 until 1982 except for three years between 1942 and 1945 when he was in the military, worked throughout all areas of the plant installing insulation. Brandt testified that he used Johns-Manville *233 pipe covering approximately ninety percent of the time and that Porter Hayden delivered the asbestos materials to American Cyanamid. He also testified that after working with the asbestos insulation, his clothes, face and body would be covered with white dust, so that he "looked like a snowman." According to Brandt, there were no health warnings on the packages of the asbestos-containing products that he used. Between 1936 until the early 1970's, Brandt installed insulation in areas where Goss and Patullo regularly worked. Brandt worked with Patullo, using the asbestos materials approximately once every two or three months, and worked with Goss, using the asbestos materials, approximately once per month.
Goss, Patullo and Patullo's wife, Theresa Patullo, instituted these actions against Porter Hayden and other manufacturers and distributors of asbestos-containing products to recover damages for the personal injuries sustained as a result of this exposure to asbestos-containing industrial products. Patullo died sometime after the action was instituted. Mrs. Patullo, who was named executrix of his estate, amended the complaint to seek wrongful death and survivorship damages. The cases were consolidated for trial. Prior to trial, all defendants, with the exception of Porter Hayden and defendant Cleaver Brooks Co. (Cleaver Brooks), settled or were dismissed from the case. At the conclusion of Goss's proofs, Goss dismissed his direct claim against Cleaver Brooks, but the latter remained in the case on Porter Hayden's cross-claim for contribution. At the conclusion of all of the proofs, the trial court granted Cleaver Brooks' motion for a judgment of dismissal. Thereafter, the trial court denied Porter Hayden's motion for a directed verdict on the ground that plaintiffs failed to demonstrate that they were exposed to any asbestos-containing products distributed or installed by it on a frequent, regular and proximate basis, as required by Sholtis v. American Cyanamid Co., 238 N.J. Super. 8, 568 A.2d 1196 (App.Div. 1989).
The trial court also denied Porter Hayden's motion to dismiss the wrongful death action brought by Mrs. Patullo on the ground *234 that she did not suffer any economic losses as a result of Patullo's death. The trial court then denied Mrs. Patullo's motion to preclude the jury from apportioning responsibility for Patullo's injuries and subsequent death between his cigarette smoking and his occupational exposure to asbestos following Dafler v. Raymark Industries, Inc., 259 N.J. Super. 17, 611 A.2d 136 (App.Div. 1992), aff'd, 132 N.J. 96, 622 A.2d 1305 (1993). Finally, the trial court reserved decision on plaintiffs' motion to limit Madsen & Howell's liability for damages to the period after 1973, when it had a systems contract with American Cyanamid.[1]
The jury returned verdicts in favor of plaintiffs. With respect to Goss, the jury assessed eighty-five percent liability against Porter Hayden and fifteen percent liability against Madsen & Howell, with no liability against Owens-Illinois. The jury awarded Goss $56,500 in damages for pain and suffering and $1.00 in damages for Goss's fear of cancer. With respect to Patullo, the jury assessed eighty-five percent liability against Porter Hayden, five percent liability against Garlock and ten percent liability against Madsen & Howell, with no liability against Owens-Illinois. The jury awarded Mrs. Patullo, as executrix, $300,000 damages for Patullo's pain and suffering, $436,000 for Patullo's wrongful death, and individually, $57,500 for her loss of consortium. The jury also found that both cigarette smoking and occupational exposure to asbestos were substantial contributing factors in causing Patullo's lung cancer, but the jury was unable to apportion liability between the two causes.
Following the jury verdicts, the trial court resubmitted the matter to the jury, directing it to redetermine Madsen & Howell's liability for damages only for the period after 1973. The jury *235 returned an amended verdict, reassessing liability at 100 percent against Porter Hayden and nothing against either Madsen & Howell or Owens-Illinois with respect to Goss, and ninety-five percent against Porter Hayden, five percent liability against Garlock, and nothing against Madsen & Howell or Owens-Illinois with respect to Patullo. The trial court denied Porter Hayden's motions for a new trial or, alternatively, for judgment notwithstanding the verdict or a remittitur. The trial court molded the jury verdict and entered judgment awarding Goss $56,500, Mrs. Patullo, as executrix of the Estate of Nicholas Patullo, $699,200 and Mrs. Patullo individually, $54,625. Porter Hayden appealed.

I.
Porter Hayden seeks a reversal of the judgment, contending among other things, that the trial court erred in failing to grant its motion for a directed verdict because plaintiffs failed to demonstrate exposure to asbestos-containing products supplied or installed by it. Porter Hayden also contends that the evidence was insufficient as a matter of law to establish that plaintiffs were exposed with the frequency, regularity and proximity demanded by Sholtis, and, therefore, it was entitled to a directed verdict or a judgment notwithstanding the verdict. We disagree. Under the rather accommodating standard of review set forth in Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969), it is perfectly clear on this record that the trial court properly denied defendant's motions for a directed verdict and for a judgment notwithstanding the jury's verdict.
In any product-liability action, a plaintiff must demonstrate "so-called product-defect causation  that the defect in the product was a proximate cause of the injury." Coffman v. Keene Corp., 133 N.J. 581, 594, 628 A.2d 710 (1993). "When the alleged defect is the failure to provide warnings, a plaintiff is required to prove that the absence of a warning was a proximate cause of his harm." Ibid. In an asbestos case based on a defendant's failure to warn, in addition to product-defect causation, the plaintiff must also *236 demonstrate "that his or her injuries were proximately caused by exposure to defendant's asbestos product. That is known as `medical causation.'" Ibid. (citing Sholtis, supra, 238 N.J. Super. at 30-31, 568 A.2d 1196). Recently, we stated:
[F]or a defendant to be held liable, the exposure to the products of such defendant, whether proven directly or circumstantially, or if reconstructed or even risk-weighted, must have been a proximate cause of, i.e., a substantial factor in bringing about, plaintiffs' injuries.
[Sholtis, supra, 238 N.J. Super. at 25, 568 A.2d 1196].
In an asbestos case, a plaintiff must also demonstrate more than mere casual or minimal exposure to asbestos in order to prove medical causation. A plaintiff must prove that the asbestos exposure was "of sufficient frequency, with a regularity of contact, and with the product in close proximity...." Id. at 28, 568 A.2d 1196. These factors "should be balanced for a jury to find liability." Ibid. The "frequency, regularity and proximity" test should not be applied as mere "catch words" and the underlying concept should not be lost. Sholtis, supra, 238 N.J. Super. at 29, 568 A.2d 1196. The proof of asbestos exposure need not be accomplished by direct evidence. We have recognized that in asbestos cases, "[s]ince proof of direct contact is almost always lacking ... courts must rely upon circumstantial proof of sufficiently intense exposure to warrant liability." Ibid.
Porter Hayden correctly points out that it is not sufficient for plaintiffs to have shown that asbestos-containing products supplied by it were in use at the plant without actual proof linking the exposures of Goss and Patullo to those products. See Menne v. Celotex Corp., 861 F.2d 1453, 1461-62 (10th Cir.1988); Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162 (4th Cir.1986); Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1484-85 (11th Cir.1985); Becker v. Baron Brothers, 138 N.J. 145, 649 A.2d 613 (1994); Eckenrod v. GAF Corp., 375 Pa.Super. 187, 544 A.2d 50, 53, appeal denied, 520 Pa. 605, 553 A.2d 968 (1988). Thus, Goss and Patullo had to show not only that Porter Hayden's asbestos-containing products were used at American Cyanamid, but also that each of them were exposed to the asbestos from *237 those specific products frequently, on a regular basis, and with sufficient proximity so as to demonstrate the requisite causal connection between the exposure and plaintiffs' illnesses.
Here, there was sufficient evidence presented to demonstrate that Goss and Patullo were exposed at American Cyanamid to asbestos-containing products distributed or installed by Porter Hayden and that their exposure occurred with sufficient regularity, frequency and proximity so as to warrant the trial court's denial of defendant's motion for a directed verdict. Goss and Patullo worked in the presence of asbestos dust while employed as departmental mechanics at American Cyanamid. As previously mentioned, Goss spent approximately thirty percent of his work time either applying or removing asbestos insulation. He also repaired boilers which were covered with asbestos-containing insulation after which he would be completely covered with white dust. Patullo inhaled dust which was released when the asbestos-containing insulation materials were cut. Goss and Patullo also were exposed to asbestos indirectly while their co-workers installed the asbestos-containing insulation. In our view, this evidence demonstrated that Goss and Patullo were sufficiently exposed to the asbestos-containing products.
The evidence also demonstrated specifically that Goss and Patullo were exposed to asbestos-containing products that Porter Hayden installed or distributed. According to Goss, most of the asbestos pipe covering that he used was manufactured by Johns-Manville, and he also used corrugated asbestos sheeting manufactured by Johns-Manville once or twice per year. Patullo also installed and removed asbestos-containing pipe covering manufactured by Johns-Manville. Additionally, as previously mentioned, Brandt, one of Goss' and Patullo's co-workers, testified that he used Johns-Manville pipe covering approximately ninety-percent of the time and installed insulation in areas where Goss and Patullo regularly worked. Brandt also recalled that Porter Hayden delivered all the asbestos materials to American Cyanamid.
*238 Porter Hayden acted as an ICU for Johns-Manville from 1927 until the 1960's. During that time, Porter Hayden serviced American Cyanamid as one of its accounts. Porter Hayden's vice-president and one of its managers testified that Porter Hayden supplied Johns-Manville asbestos-containing products to American Cyanamid. Porter Hayden also admitted to this in its answer to interrogatories, which were read to the jury at trial. Even one of Porter Hayden's competitors, Charles S. Woods Company, was required to purchase Johns-Manville materials through Porter Hayden when using those materials at American Cyanamid.
These proofs sufficiently established that Porter Hayden supplied Johns-Manville asbestos-containing materials to American Cyanamid. In fact, based on the proofs, the conclusion is compelled that Porter Hayden was the "final link in the commercial chain of distribution of [Johns-]Manville products to the American Cyanamid plant." In any event, the jury was free to make the logical link between Porter Hayden's distribution of Johns-Manville asbestos products to the plant and Goss's and Patullo's exposure to those products. Giving plaintiffs "all inferences which could reasonably and legitimately be deduced" from the evidence, the jury could reasonably conclude that Goss and Patullo were exposed to asbestos contained in products distributed or installed by defendant Porter Hayden with sufficient frequency, regularity and proximity required to establish proximate causation under Sholtis.
Alternatively, Porter Hayden contends that the verdict was against the weight of the evidence and, therefore, the trial court should have granted a new trial. Pursuant to R. 4:49-1(a), a trial court may grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." In Dolson, supra, the Supreme Court described the process the trial court is to undertake in evaluating such motions:

*239 A process of evidence evaluation,  "weighing" , is involved, which is hard indeed to express in words. This is not a pro forma exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury.
[Dolson, supra, 55 N.J. at 6, 258 A.2d 706].
Applying this standard here, we are satisfied that from our review of the record it does not fully and convincingly appear that there was a miscarriage of justice under the law. See R. 2:10-1; Dolson, supra, 55 N.J. at 6-7, 258 A.2d 706. Consequently, we hold that the trial court properly denied Porter Hayden's motions for a directed verdict and for a judgment not withstanding the verdict.

II.
Porter Hayden also contends that the jury verdicts as to damages were grossly excessive and resulted in a miscarriage of justice, requiring a new trial or, alternatively, a remittitur. The principles governing our analysis of this issue have succinctly been set forth by Justice Handler in his recent opinion in Caldwell v. Haynes, 136 N.J. 422, 431-32, 643 A.2d 564 (1994), as follows:
A trial court may order a new trial when, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1. A trial court should set aside excessive verdicts only in "clear cases." Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 330 [261 A.2d 657] (1970). In assessing whether the quantum of damages assessed by the jury is excessive, a trial court must consider the evidence in the light most favorable to the prevailing party in the verdict. Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236 [276 A.2d 861] (1971); see Baxter v. Fairmont Food Co., 74 N.J. 588, 597 [379 A.2d 225] (1977) (holding that trial court's findings of fact entitled to respect). Therefore, a trial court should not interfere with a jury verdict unless the verdict is clearly against the weight of the evidence. Horn v. Village Supermarkets, Inc., 260 N.J. Super. 165, 178 [615 A.2d 663] (App.Div. 1992), certif. denied, 133 N.J. 435 [627 A.2d 1141] (1993). The verdict must shock the judicial conscience. Carey v. Lovett, 132 N.J. 44, 66 [622 A.2d 1279] (1993).
In reviewing a trial court's ruling on a motion for a new trial, an appellate court shall not reverse a trial court "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. Accordingly, "The standard for appellate review of a trial court's decision on a motion for a new trial is substantially the same as that controlling the trial court except that due deference should be made to its `feel of the case,' including credibility." Feldman v. Lederle *240 Lab, 97 N.J. 429, 463 [479 A.2d 374] (1984) (quoting Dolson v. Anastasia, 55 N.J. 2, 6 [258 A.2d 706] (1969)).
Furthermore, where a party seeks a remittitur of the damages awarded by a jury, "a trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injury and resulting disability shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977); Sweeney v. Pruyne, 67 N.J. 314, 315, 338 A.2d 193 (1975). The judgment of the initial factfinder, whether a judge or jury, is owed considerable respect and should not be upset
except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice. The process of "weighing" the evidence is not to encourage the judge to "evaluate the evidence as would a jury to ascertain in whose favor the evidence preponderates" (Kulbacki v. Sobchinsky, 38 N.J. 435, 455 [185 A.2d 835] (1962) (Haneman, J., concurring) and on that basis to decide upon disruption of the jury's finding. "[T]he judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror." Dolson v. Anastasia, supra, 55 N.J. at 6 [258 A.2d 706]. Nevertheless, the process of evidence evaluation called "weighing" is not "a pro forma exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury." Id. It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted.
[Baxter, supra, 74 N.J. at 597-598, 379 A.2d 225].
On appeal the same standard applies to an appellate court reviewing a trial judge's determination except that the trial court's opportunity to develop a "feel of the case" is entitled to deference. See Dolson, supra, 55 N.J. at 7, 258 A.2d 706; Baxter, supra, 74 N.J. at 600, 379 A.2d 225; Fritsche v. Westinghouse Electric Corp., 55 N.J. 322, 330, 261 A.2d 657 (1970).
In assessing damages in tort actions there generally is no precise correspondence between money and physical or mental suffering. Rather, the only method for evaluating damages is to identify "such amount as reasonable persons estimate to be fair compensation." Botta v. Brunner, 26 N.J. 82, 95, 138 A.2d 713 *241 (1958); Lewis v. Read, 80 N.J. Super. 148, 174, 193 A.2d 255 (App.Div.), certif. granted, 41 N.J. 121, 195 A.2d 17 (1963). See Deemer v. Silk City Textile Mach. Co., 193 N.J. Super. 643, 651, 475 A.2d 648 (App.Div. 1984). Reasonable compensation for a plaintiff's injuries and losses in a tort action should include
compensation for his bodily injuries, for the pain and suffering resulting therefrom, past, present and future, for the effect of those injuries upon his health according to their degree and probable duration, and for any permanent disability which in reasonable probability has resulted or will result. To that sum should be added all expense, past and future, reasonably necessary or incidental to plaintiff's efforts to cure or alleviate his injuries or resulting disability, and all other pecuniary losses suffered or to be suffered in the future as the result of his inability to engage in his usual occupation.
[Theobold v. Angelos, 40 N.J. 295, 304, 191 A.2d 465 (1963)].
With respect to the assessment of damages in wrongful death actions, N.J.S.A. 2A:31-5 provides:
In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent.
In New Jersey, "`pecuniary injuries' suffered by the surviving next of kin is the standard for all wrongful death cases." Green v. Bittner, 85 N.J. 1, 11, 424 A.2d 210 (1980) (emphasis in original). An award of damages in a wrongful death action is not intended to punish the tortfeasor, but only to replace that which the decedent likely would have provided. Hudgins v. Serrano, 186 N.J. Super. 465, 476, 453 A.2d 218 (App.Div. 1982).
Loss of companionship, guidance, advice and counsel must be confined to their pecuniary element and their value "must be confined to what the marketplace would pay a stranger with similar qualifications for performing such services." Green, supra, 85 N.J. at 12, 424 A.2d 210; Hudgins, supra, 186 N.J. Super. at 476, 453 A.2d 218. For example, the advice, guidance or counsel that is compensable must be "the kind of advice, guidance *242 or counsel that could be purchased from a business adviser, a therapist, or a trained counsellor." Green, supra, 85 N.J. at 14, 424 A.2d 210.
By necessity, wrongful death verdicts vary tremendously and must be examined carefully on a case-by-case basis. See, e.g., Rodriquez v. United States, 823 F.2d 735 (3rd Cir.1987); Tirrell v. Navistar Intern., Inc., 248 N.J. Super. 390, 591 A.2d 643 (App. Div.), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991); Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381, 181 A.2d 400 (App. Div.), certif. denied, 38 N.J. 183, 183 A.2d 88 (1962).
Considered in the light of these governing principles, we are satisfied that the jury's damage awards should be affirmed.

A.
Turning first to Goss's award of $56,500 for pain and suffering and $1.00 for fear of developing cancer, the proofs established that Goss experiences shortness of breath when he has to climb steps, walk distances or exert himself. The shortness of breath, which began four or five years prior to trial and occurs a couple of times per day, leads him to cough and makes him feel as though he cannot breathe. The medical evidence demonstrated that Goss had parenchymal asbestosis and asbestos-related pleural disease. The evidence also demonstrated that Goss can no longer lead the life to which he had grown accustomed. He cares for his home, but has to stop and rest while doing housework. He is forced to rely on his son to help him accomplish daily activities, such as laundry and housework.
The jury found that Goss' exposure to asbestos was a significant contributing factor to his illness and awarded him $56,500 for his pain and suffering. Although Goss does not currently have cancer, he testified that he has a fear of developing cancer, for which the jury awarded him $1.00. In our view, these damage awards were reasonable and supported by the proofs. In any event, they were not so disproportionately high as to shock the judicial *243 conscience or to be manifestly unjust. The trial court, therefore, properly refused to grant Porter Hayden's motions for a remittitur or for a new trial on damages.

B.
The jury's award of $300,000 to Mrs. Patullo, as executrix of the estate of Patullo, for Patullo's pain and suffering, is also sustainable. The proofs demonstrated that Patullo's discovery that he had lung cancer began in April of 1990, when he and his wife noticed a rattling and whistling sound in his breathing and he experienced pain in his right shoulder blade. He underwent a bronchoscopy which revealed malignant cells related to adenocarcinoma and a mass in the right lung. The doctor told Patullo and his family that Patullo had lung cancer and likely would only live for one more year.
In April of 1990, Patullo underwent lung surgery in which a lobe of his right lung containing the adenocarcinoma was removed. In June of 1990, Patullo started receiving chemotherapy and blood transfusions, yet his health deteriorated quickly. Patullo continued to undergo radiation and chemotherapy for approximately six weeks. Thereafter, Patullo's condition worsened quickly. A myelogram revealed the presence of a lesion which was destroying bone within the spinal cord. The myelogram was extremely painful. Patullo was hospitalized three more times and received two additional courses of chemotherapy. His final hospitalization occurred because he suffered from anemia, gastrointestinal bleeding and increasingly severe fatigue. On March 12, 1991, Patullo died of lung cancer with bone metastases. For the eleven months of his cancer-related illness, Patullo was weak, depressed and in extreme pain. In his deposition testimony, Patullo stated, "I feel bad. I can't take it anymore."
Plaintiff's medical testimony confirmed the severity of Patullo's pain and suffering. Dr. Hochran concluded that Patullo "had a lung cancer that had metastasized which ultimately was a cause of his death and he had bronchymal asbestosis and he had... *244 asbestos related pleural disease." The doctor identified the cause of Patullo's death as "the ravages of his lung cancer" and opined that Patullo's "asbestos exposure was a significant substantial contributing factor to the development of his lung cancer." Dr. Hochran also testified that the extreme pain that Patullo experienced was largely caused by the cancer, not the Paget's disease. In light of the proofs, the jury's award of $300,000 for Patullo's pain and suffering during his lifetime is not so disproportionate to the injuries and disabilities sustained by Patullo to shock our conscience or to be manifestly unjust.

C.
The jury also awarded Mrs. Patullo $436,000 for Patullo's wrongful death. Patullo died at the age of sixty-seven with a remaining life expectancy of 15.20 years. The evidence established that he and Mrs. Patullo had been married for forty-three years and enjoyed a very close marital relationship. Before Patullo's illness, they had an active social life, and were very close to their children and grandchildren. Patullo had Paget's disease, but he was able to walk, golf and exercise. After he contracted the cancer, he was unable to engage in these activities. Patullo was forced to leave work before he was diagnosed with asbestosis because of his Paget's disease, and spent his time thereafter helping around the house, including preparing dinner when Mrs. Patullo worked part-time. Patullo drove Mrs. Patullo everywhere because she did not drive. After Mrs. Patullo underwent two serious operations, Patullo cared for her. After the onset of Patullo's asbestos related illness, Mrs. Patullo had to do everything around the house herself and had to care for Patullo as well. According to Mrs. Patullo, after Patullo became ill, they never returned to a normal lifestyle.
Mrs. Patullo testified that Patullo provided her with emotional support. When asked, Mrs. Patullo did not specifically describe this emotional support, but testified that Patullo cared for her after she had two serious operations. Patullo used to help her *245 prepare the meals, take her grocery shopping, run errands and help around the house. Additionally, Patullo managed the family finances. When Patullo died, Mrs. Patullo lost all of Patullo's services, companionship, guidance, advice and counsel, all of which had significant pecuniary value.
Although the jury's award with respect to the wrongful death action may have been on the high side of the legitimate range of damages, we are satisfied that it does not require appellate intrusion. Reasonable minds could accept the evidence at trial as adequate to support the jury's award for Patullo's wrongful death. See Kulbacki v. Sobchinsky, 38 N.J. 435, 445, 185 A.2d 835 (1962); Hacker v. Statman, 105 N.J. Super. 385, 391, 252 A.2d 406 (App. Div.), certif. denied, 54 N.J. 245, 254 A.2d 791 (1969). In sum, there is no clear and convincing proof of a miscarriage of justice and we certainly do not perceive the sense of "wrongness" that is necessary to overturn the damage awards in these consolidated matters. See Baxter, supra, 74 N.J. at 603, 379 A.2d 225; Taweel, supra, 58 N.J. at 236-37, 276 A.2d 861.

D.
Finally, we are satisfied that the damage award to Mrs. Patullo of $57,500 for her loss of consortium is also sustainable. Mrs. Patullo was without the services and consortium of her husband from the time he became ill to the date of his death, approximately one year. Patullo testified in depositions before his death that his illness and constant pain prohibited him from engaging in his normal relationship with his wife and in any social activities. Patullo also testified that his wife did everything for him while he was ill. Clearly, Patullo's asbestosis and resulting cancer severely impacted his marital relationship with his wife.
Moreover, there is no indication on this record that the jury overlapped its damages awards and provided duplicate recovery to Mrs. Patullo under the wrongful death and the loss of consortium actions. The jury was instructed that the wrongful death award was to compensate Mrs. Patullo for Patullo's services from the *246 date of death to the present time. With respect to the loss of consortium award, the trial court specifically instructed the jury that any award was to compensate Mrs. Patullo for the loss of Patullo's "services, society and consortium from the date he incurred his illness up until the time of his death." The trial court instructed the jury that "[e]verything else of course is included in the wrongful death and the lifetime claim for his pain and suffering." In sum, the jury's award of $57,500 to Mrs. Patullo for loss of consortium is not manifestly unjust and does not shock the judicial conscience.

III.
Porter Hayden also contends that the trial court erred in resubmitting the matter to the jury with direction that the jury redetermine Madsen & Howell's liability for damages only for the period after 1973.
At the close of the proofs, plaintiffs moved for a judgment limiting Madsen & Howell's liability to post-1973, because they claimed that Madsen & Howell did not enter into a systems contract with American Cyanamid until 1973. The trial court denied the motion but left open the issue to be dealt with later. The jury returned verdicts in favor of plaintiffs based on interrogatories which did not limit Madsen & Howell's liability as to any specific time. The jury assessed Madsen & Howell with fifteen percent liability for Goss' damages and ten percent liability for Patullo's damages. After the jury returned its initial verdicts, the trial court resubmitted the matter to the jury with direction to redetermine Madsen & Howell's liability only after the effectuation of a 1973 systems contract with American Cyanamid. The jury returned an amended verdict absolving Madsen & Howell of any liability for plaintiffs' damages. The trial court set aside in part the original verdict and entered judgment on the second verdict, reasoning:
There is not a scintilla of evidence that Madsen & Howell provided asbestos containing products to the American Cyanamid plant prior to 1973. The inference *247 raised or sought to be raised by ... Porter Hayden is that because Mr. Madsen came and went on a regular basis as a salesperson to the American Cyanamid plant that there should be an inference raised that he sold them asbestos containing products inasmuch as they were available to customers of Madsen & Howell in a general sense. Although specifically denied by Mr. Madsen prior to 1973 when he got the systems contract.
Accordingly, as a matter of law, I'm striking the first verdict and entering as judgment the judgment reflecting responsibility of Madsen & Howell from 1973 on wherein there was an admission by Mr. Madsen of the sale of asbestos containing products.
Although John E. Madsen, Chairman of Madsen & Howell, testified that he could not recall selling any packaging and gasket material to American Cyanamid prior to 1973, when he first entered into a systems contract with American Cyanamid, the evidence in the record presents an inference that Madsen & Howell sold asbestos products to American Cyanamid prior to 1973. Madsen testified on deposition that Madsen & Howell distributed Johns-Manville products such as packing and roof-coating which contained asbestos. In the 1950's Johns-Manville began supplying packing and gaskets to Madsen & Howell, and in fact supplied Madsen & Howell with approximately sixty percent of all the asbestos products it received. Madsen & Howell began selling products to American Cyanamid in the late 1930's or early 1940's when American Cyanamid was known as Kalko Chemical. Mr. Madsen, who was the only salesman who conducted business with American Cyanamid from the early 1940's until the present, also testified that he sold products to American Cyanamid on a day-to-day basis. Moreover, Madsen testified on deposition in a prior case that Madsen & Howell began supplying asbestos-containing products to American Cyanamid in the early 1970's, and in answers to interrogatories which were read to the jury admitted that:
[p]roducts containing asbestos fibers have been distributed by Madsen & Howell, Inc. from 1936 through such times as the manufacturers ceased making these asbestos-containing products. The products were manufactured or wholesaled by various different companies. Madsen & Howell incorporated general sales area includes Middlesex, northern Monmouth[,] Union and Eastern Somerset counties....
*248 The American Cyanamid plant in which Goss and Patullo worked was located in Eastern Somerset county.
A reasonable inference to be drawn from the proofs is that Madsen & Howell supplied American Cyanamid with asbestos-containing products from the outset of its selling relationship with American Cyanamid in the 1950's. At the very least, the proofs raised a genuine issue of material fact as to whether Madsen & Howell distributed asbestos-containing products to American Cyanamid before 1973, and that those products were a significant contributing factor to Goss' and Patullo's injuries and Patullo's eventual death. There was sufficient credible evidence to submit these issues to the jury, which were resolved against Madsen & Howell. Therefore, the trial court erred in setting aside the jury's initial verdict and resubmitting the issue as to Madsen & Howell's liability, limiting it solely to the period after 1973.
Consequently, the trial court erred when it set aside the first jury verdict and entered judgment molded on the second jury verdict. We reinstate the initial jury verdicts and remand the matter to the trial court for the entry of amended judgments consistent with this opinion.

IV.
Finally, we are satisfied from our study of the record and arguments presented that all other issues of law raised by Porter Hayden are clearly without merit. R. 2:11-3(e)(1)(E).

V.
Accordingly, except to vacate the judgment entered on the second jury verdict, reinstate the initial jury verdict and remand the matter to the trial court for the entry of an amended judgment consistent with this opinion, the judgment under review is affirmed.
NOTES
[1] Although Madsen & Howell was a settling defendant, whether it was a tortfeasor at all, and if so, to what extent, is relevant to Porter Hayden's monetary contribution to plaintiffs' verdicts. See Rogers v. Spady, 147 N.J. Super. 274, 371 A.2d 285 (App.Div. 1977); see also Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 410 A.2d 674 (1980); Kiss v. Jacob, 268 N.J. Super. 235, 633 A.2d 544 (App.Div. 1993), certif. granted, 137 N.J. 165, 644 A.2d 613 (1994).