# Illinois Official Reports

## Appellate Court

***Startley v. Welco Manufacturing Co.*, 2017 IL App (1st) 153649**

| | |
|---|---|
| Appellate Court Caption | JO ANN STARTLEY, Individually and as Executor of the Estate of Ronnie A. Startley, Deceased, and on Behalf of Their Children, Plaintiff-Appellant, v. WELCO MANUFACTURING COMPANY, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-15-3649 |
| Rule 23 order filed<br>Motion to publish allowed<br>Rehearing denied<br>Opinion filed | March 14, 2017<br><br>April 27, 2017<br>April 27, 2017<br>May 9, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-2716; the Hon. James M. McGing, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Robert N. Wadington & Associates, of Chicago (Robert N. Wadington, of counsel), and Baron & Budd, P.C., of Dallas, Texas (Renee M. Melancon, of counsel), for appellant.<br><br>Segal McCambridge Singer & Mahone, Ltd., of Chicago (Catherine E. Goldhaber and Paul E. Wojcicki, of counsel), and Rasmussen, Willis, Dickey & Moore, LLC, of Kansas City, Missouri (Steven B. Moore and Christopher Turney, of counsel), for appellee. |

| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Pierce and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1     The estate of Ronnie Startley filed a complaint against Welco Manufacturing Company (Welco), claiming that asbestos from Welco's products caused Ronnie to contract mesothelioma. The trial court directed a verdict in favor of Welco because no witness could specify how often Ronnie used Welco's products in his work. We find the evidence sufficient to create an issue of material fact as to whether use of Welco's products caused Ronnie to develop mesothelioma. We also hold that Illinois law applies to this case, the estate presented sufficient evidence to show that Welco had a duty to warn users of the dangers of asbestos dust, and the estate presented sufficient evidence to show that the specific kinds of asbestos fiber found in Welco's products caused Ronnie to develop mesothelioma. Accordingly, we reverse the judgment entered in favor of Welco and remand for a new trial.

¶ 2                                    BACKGROUND

¶ 3     Ronnie lived and worked almost all of his life in Alabama. In his work finishing drywall, he regularly used several brands of joint compounds that contained asbestos. Ronnie moved with his family to Illinois in 1965. He worked there with his cousin, Walter Startley, for three or four months before returning to Alabama.

¶ 4     In 2013, doctors discovered that Ronnie had contracted mesothelioma. Ronnie filed a complaint against a number of corporations that manufactured the brands of joint compound that Ronnie used during his lengthy career. Ronnie died in 2014, and his wife Jo Ann Startley, as executor for Ronnie's estate, became the plaintiff in the lawsuit. The estate either dismissed outright or settled with most of the defendants. When the case came to trial in 2015, only one defendant, Welco, remained.

¶ 5     The estate's amended complaint included no allegations concerning Ronnie's extensive exposure to asbestos while he worked in Alabama because Alabama's statute of limitations completely barred all of the estate's claims as untimely. Welco filed a motion for summary judgment, and the estate filed a response. Both parties attached transcripts from several depositions to their briefs. Walter, in his discovery and evidence depositions, explained the work he and Ronnie did. They came to work sites after other workers hung the drywall. Walter and Ronnie took 25-pound sacks of dry joint compound, poured some in a five-gallon bucket, mixed it with water, and then spread three or four coatings of the compound on the drywall. They sanded after each coating, with the most extensive sanding after the final coating. Walter could see dust from the joint compound both when they poured the compound in the bucket and when they sanded the coatings on the drywall. Expert testimony supported the estate's assertion that the dust from the joint compounds included asbestos and that asbestos from the joint compounds contributed to causing Ronnie to contract mesothelioma.

¶ 6     Walter estimated that he and Ronnie worked on "close to 50" commercial sites, plus some houses, in the three or four months they worked together in Illinois in 1965. Walter could not

recall which brand of joint compound they used at any specific site. The following exchange took place during Walter's evidence deposition:

"Q. *** Do you remember the brand names of joint compounds that you'd use while you were in Chicago in 1965 with Ronnie?

A. USG, Gold Bond, Bestwall and Wel-Cote.

Q. Did you use any of those more than the others?

A. Wel-Cote and Bestwall was the most we used.

* * *

Q. *** Earlier your counsel was asking you whether or not you remembered if one product was on site more than the other. Do you recall him asking you that?

A. I couldn't because, you know, there's no way of me knowing, really.

* * *

Q. *** [Y]ou can't tell me whether or not you recall there being more jobs that had one product versus the other; is that correct?

***

A. Well, I really can't, because *** that's a long time ago ***, but I remember the bags was being like gray-looking stuff and I imagine it would be Wel-Cote or—or Bestwall.

* * *

Q. *** [C]an you tell me any job site that you remember Ronnie being on where Bestwall was being used?

A. Lord, I couldn't say that. I don't know, there was so many jobs back then."

¶ 7 Welco argued that because Walter did not recall how frequently Ronnie used Welco's Wel-Cote joint compound in Illinois and he could not specifically identify any particular job for which they used Wel-Cote, the evidence did not meet established standards for showing that Welco's products proximately caused Ronnie to contract mesothelioma. The trial court denied the motion for summary judgment.

¶ 8 At the jury trial, Dr. Richard Lemen testified that the term "asbestos" refers to several distinct chemical compounds with some similar properties. A form of asbestos called "chrysotile" makes up more than 90% of the asbestos used commercially. Although chrysotile occurs naturally in long fibers, the fibers break down rapidly in processing, and relatively short fibers make up the chrysotile used in most products. Two other forms of asbestos, amosite and crocidolite, do not break down as rapidly as chrysotile. Some researchers have concluded that crocidolite has much greater potency and causes disease at much lower concentrations than chrysotile. However, according to Dr. Lemen, "all of the fiber types cause mesothelioma."

¶ 9 Dr. Lemen testified that scientists started studying the dangers of asbestos in the 1920s. He said, "by the early to mid-1930s, the association with the dust was well established, and methods were laid out to suppress dust in hopes of reducing the amount of disease." Doctors knew then of the link between asbestos and both asbestosis and lung cancer. Mesothelioma occurs more rarely, and researchers did not much study the link between asbestos and mesothelioma until the early 1960s. But generally, the United States Public Health Service had established the danger of asbestos dust by 1964.

¶ 10    Dr. Arnold Brody testified that all varieties of asbestos cause all of the asbestos diseases, including mesothelioma. He explained in detail the mechanisms by which asbestos damages the cells around the lungs.

¶ 11    Dr. Eugene Mark testified that Ronnie's lifelong work with joint compounds that contained asbestos caused him to contract diffuse malignant mesothelioma, and his exposures over several months of work in Illinois were "substantial contributing factors" to causing the mesothelioma.

¶ 12    The following exchange took place on cross-examination of Dr. Mark:

"Q. Do you agree that with regard to asbestos fibers, dimension is important, the length and the width of the fiber?

A. To some degree, the longer fibers are more oncogenic than shorter fibers; but beyond that, I wouldn't be able to say. ***

Q. *** Do you agree that fibers shorter tha[n] 5 microns in length have not been proven to cause diffuse malignant mesothelioma?

A. Essentially, yes. There is evidence to it, but I don't believe that the evidence is definitive."

¶ 13    Dr. Mark added that pure chrysotile, in which less than 1% of the substance consists of other forms of asbestos, occurs only in laboratory settings. He said, "in the real world, products have 5 percent, 10 percent, 2 percent" contamination with other forms of asbestos. And he said, "The majority opinion is that chrysotile causes diffuse malignant mesothelioma at any level." Any level of exposure to chrysotile increases the risk of disease, and the risk increases as the level of exposure increases.

¶ 14    The jury watched an edited version of Walter's evidence deposition. Welco objected to several passages from the deposition, and the trial court resolved the objections. In the video recording played for the jury, Walter said that he and Ronnie used "USG, Gold Bond, Bestwall and Wel-Cote." The parties deleted from the recording the passage in which Walter said, "Wel-Cote and Bestwall was the most we used." The record on appeal does not explain the deletion. Welco's list of objections includes no objection to the deleted testimony. The jury heard the passage in which Walter said he "imagine[d]" they used Wel-Cote or Bestwall most.

¶ 15    The jury also heard questions about the packaging:

"Q. *** Can you tell me the color of any of the writing on the bags?

A. Black.

* * *

Q. *** And the Bestwall, what—what color [bag] would that have been in?

A. I can't—seemed like it was a light—lighter color brown or something, seemed like."

¶ 16    A photograph of a Wel-Cote bag of the kind used in 1965 showed a bag that one might describe as beige or light brown, with both black lettering on a light brown background and light brown lettering on a black background.

¶ 17    The parties stipulated that Welco used chrysotile in its joint compound and that its bags bore no warnings.

¶ 18    At the close of the estate's case, Welco moved for a directed verdict, arguing that the evidence did not prove (1) that Welco had a duty to warn users about the danger of working

with the joint compound, (2) that asbestos of the kind found in Wel-Cote caused Ronnie to contract mesothelioma, and (3) that exposure to Welco's products occurred with sufficient frequency for it to constitute a significant factor causing Ronnie to contract mesothelioma. Welco also renewed its argument that Alabama law barred the estate's claim.

¶ 19    The trial court said, "there's only one witness, Walter," to show that Ronnie used Wel-Cote at the jobs in Illinois. The court said:

> "[Walter] names four different joint compounds that he says they used in Chicago in 1965, that he used with Ronnie: USG, Gold Bond, Bestwall, and Wel-Cote.
>
> He doesn't even really remember anything regarding these bags. He talks about a gray color ***.
>
> * * *
>
> He was asked *** 'You can't tell me whether or not you recall there being more jobs that had one product versus the other; is that correct?'
>
> 'I really can't because I don't—that's a long time ago.' Then he says, 'And I couldn't really tell, but I remember the bags being like gray looking.'
>
> *** [T]here were exhibits entered into evidence. They certainly don't demonstrate gray looking bags.
>
> * * *
>
> *** [T]here's very minimal product identification in this case. There is no testimony to support frequency of the [use of] defendant's product. There's no testimony to support repeated exposure to the defendant's product. ***
>
> * * *
>
> The Court finds that the plaintiff has not met its burden *** and that to allow this case to proceed and to be tendered to the jury that any decision for damages would be based upon nothing more than speculation or conjecture."

¶ 20    The court granted Welco's motion for a directed verdict. The estate now appeals.

¶ 21                                    ANALYSIS

¶ 22    We review *de novo* the decision to enter a directed verdict. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). "A motion for directed verdict *** will not be sustained unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. [Citation.] *** [A]ll of the evidence must be reviewed in a light most favorable to the opponent of the motion." *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 353-54 (1992).

¶ 23                     Frequency, Regularity, and Proximity

¶ 24    The *Thacker* court held that, if a plaintiff seeks to recover damages from a manufacturer because a worker has contracted an asbestos-related disease, the plaintiff must show that "(1) [the injured worker] regularly worked in an area where the defendant's asbestos was frequently used and (2) the injured worker did, in fact, work sufficiently close to this area so as to come into contact with the defendant's product." *Thacker*, 151 Ill. 2d at 359. The *Thacker* court called this approach the "frequency, regularity and proximity" test. (Internal quotation marks omitted.) *Thacker*, 151 Ill. 2d at 359.

¶ 25    The *Thacker* court then applied the test to the facts of the case and said:

"[T]he evidence showed that plaintiff worked in the UNARCO plant for more than eight years and that at least 75 tons of defendant's *raw* asbestos was processed at the plant during this time. The defendant notes in its brief that even under the most generous calculation, a maximum of just 3% of the total dust in the plant could have been generated from Manville asbestos and that the actual dust at the decedent's work site was, in all likelihood, significantly less. In light of plaintiff's medical evidence which indicated that even slight exposure would adversely affect the decedent's health, however, and in light of the total volume of asbestos at the UNARCO facility, we cannot say that 3% is insignificant as a matter of law. (*Cf. Sholtis v. American Cyanamid Co.* (1989), 238 N.J. Super. 8, 25-26, 568 A.2d 1196, 1205 (finding that several parties collectively responsible for 5% to 10% of airborne asbestos could each be held liable).) To the contrary, we believe that the evidence developed at trial as to the amount of Manville asbestos likely to have been used at the facility, the nature of the work performed there and the extended period of time the decedent worked within the plant are sufficient for us to conclude that there was frequent use of Manville asbestos at the Bloomington facility where the decedent regularly worked." (Emphasis in original.) *Thacker*, 151 Ill. 2d at 360.

¶ 26    Here, in the testimony presented at trial, Walter said little about the frequency with which he and Ronnie used Wel-Cote. He remembered a light brown bag of joint compound, but he thought Bestwall came in the light brown bag. He made no guess as to the color of Welco's bags. He testified that he could not "recall there being more jobs that had one product versus the other."

¶ 27    Courts from several jurisdictions have applied the frequency, regularity, and proximity test to similarly vague testimony in a number of cases. In *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304 (Tex. Ct. App. 2007), the court summarized cases in which courts found the evidence insufficient to show that the defendants' products caused the plaintiffs' diseases. Stephens worked around asbestos dust emanating from several manufacturers' products. After Stephens contracted mesothelioma, he sued Georgia-Pacific for causing the disease. A jury found in favor of Stephens. On appeal, the *Stephens* court said:

"The record does not reveal, however, how frequently this dust came from Georgia-Pacific's joint compound, as opposed to one of the other joint compound products [Stephens's] coworkers recalled seeing on their job sites. [Stephens's] coworkers recalled seeing ten different joint compound products: Kaiser Gypsum, Bestwall, Flintkote, Gold Bond, Georgia-Pacific Ready-mix, Georgia-Pacific dry powder, Kelly Moore patching, Paco, Durabond, and USB. Lenius testified that Kaiser Gypsum, Gold Bond, and Flintkote were used most frequently.

In this record, there is no evidence concerning the percentage of Georgia-Pacific joint compound used in comparison to the quantity of other products used on [Stephens's] job sites, nor any quantitative estimate of the number of times Georgia-Pacific joint compound was used on [Stephens's] job sites. On the other hand, there is evidence that three other joint compounds were used more frequently than Georgia-Pacific's product. Thus, although there was evidence that [Stephens] was exposed to asbestos-containing joint compound generally, there was no quantitative evidence presented upon which [Stephens's] experts could rely to determine that he

- 6 -

was exposed to Georgia-Pacific's product in sufficient quantities to have increased his risk of developing mesothelioma. [Citation.]

Other courts that have considered similar factual scenarios have reached the same conclusion. For example, the Eastland Court of Appeals recently decided a case in which a brake worker had inhaled asbestos dust from installing the brake products of six different manufacturers. *Vaughn v. Ford Motor Co.*, 91 S.W.3d 387, 393 (Tex.App.—Eastland 2002, pet. denied). When Vaughn was asked whether he had used the various products equally, one more than another, or one less than another, he replied that he did not know. *Id.* The court, applying Illinois law regarding the frequency-regularity-proximity test, concluded that, '[a]lthough there was evidence from which a jury could have found that Vaughn's exposure to asbestos-containing brake products was a cause of his [mesothelioma] and evidence that each exposure contributed to his disease, there was no evidence from which a jury could have found that Vaughn was frequently exposed to any particular defendant's brake product.' *Id.* at 392, 394.

Likewise, the United States Court of Appeals for the Eighth Circuit decided a case in which several witnesses testified that they had either seen or installed Owens-Corning Kaylo insulation at a tire plant. *See Jackson* [*v. Anchor Packing Co.*], 994 F.2d [1295, 1304 (8th Cir. 1993)]. The evidence indicated that numerous other insulation products were also in use at the plant. *See id.* at 1299. The court found that the plaintiffs had failed to meet the frequency-regularity-proximity test ***." *Stephens*, 239 S.W.3d at 318-19.

See also *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 383 (3d Cir. 1990) (frequency, regularity, and proximity test not met where no witness could say how much of defendant's product workers used and how many times they used it in relevant area).

¶ 28 We find this case distinguishable from *Stephens* insofar as Walter identified Wel-Cote as one of the joint compounds most likely used more frequently than the others. But we also find more persuasive authority that apparently conflicts with *Stephens* and the authorities cited therein.

¶ 29 In *Holcomb v. Georgia Pacific, LLC*, 289 P.3d 188 (Nev. 2012), Holcomb inhaled dust from joint compounds made by several different manufacturers, but he could not specify how often he used any single manufacturer's compound. The trial court entered summary judgment against Holcomb. On appeal, the *Holcomb* court said:

"Holcomb testified that he used Kelly-Moore, Kaiser Gypsum, and Georgia Pacific products on numerous occasions and in several locations over an approximately seven-year period ***. While he could not identify the particular packaging, logos, or names of some of the products, and he could not identify specific locations and jobs on which he used the products 40 years ago, that level of identification is not required. Ultimately, his testimony and other evidence provide the basis for a reasonable inference that Holcomb's mesothelioma was caused by exposure to each of the respondents' products.

* * *

Holcomb presented evidence that he used Kelly-Moore's Paco joint-compound brand, including Paco Quik-Set, in Florida and Las Vegas. *** Holcomb stated that he

used Kelly-Moore's Paco products numerous times throughout the period. This is more than a minimal amount and, when considered with Holcomb's asserted direct exposure to asbestos in the product, may amount to regular and proximate exposure over an extended period sufficient to cause mesothelioma. Accordingly, a jury could reasonably infer that Kelly-Moore's Paco products were a substantial factor in the development of Holcomb's cancer.

\*\*\*

\*\*\* Holcomb testified that he was accustomed to using Kaiser Gypsum's products throughout his years in both Florida and Las Vegas. Holcomb testified that he used Kaiser Gypsum's products 'on several jobs, lots and lots.' \*\*\* Putting this into context with the medical evidence that minimal dosages of asbestos can contribute to mesothelioma and the more relaxed nature of the test in mesothelioma cases, [citation], we conclude that Holcomb has presented sufficient evidence to defeat summary judgment against Kaiser Gypsum. \*\*\*

\*\*\*

Holcomb testified that he used Georgia Pacific brand joint-compound products on countless jobsites in Florida and Las Vegas and was 'accustomed to using' Georgia Pacific products. Holcomb recalled seeing the Georgia Pacific name on bags, recalled using Georgia Pacific products 'a lot,' 'many times,' and remembered using Georgia Pacific products when working at the motel. Holcomb identified the Georgia Pacific brand joint compound as one he often used between 1969 and 1973 in Florida and 1975 and 1978 in Las Vegas." *Holcomb*, 289 P.3d at 198-99.

¶ 30    The *Holcomb* court reversed the summary judgment entered in favor of Kelly Moore, Kaiser Gypsum, and Georgia Pacific. *Holcomb*, 289 P.3d at 200; see also *Rotondo v. Keene Corp.*, 956 F.2d 436, 442 (3d Cir. 1992) (frequency, regularity, and proximity test met where plaintiff worked in boiler room two days per week for three months and pipecoverers used defendant's asbestos-containing product in boiler room 50% of time); *Goss v. American Cyanamid Co.*, 650 A.2d 1001, 1003, 1006 (N.J. Super. Ct. App. Div. 1994) (frequency, regularity, and proximity test met where plaintiff testified that most asbestos pipe covering he used was manufactured by defendant).

¶ 31    We find *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir. 1992), especially persuasive. Tragarz, a sheet metal worker suing to recover damages related to mesothelioma, testified that he sometimes cut Kaylo asbestos products and sometimes worked alongside insulators and pipefitters when they cut and installed Kaylo asbestos products. He worked with Kaylo products "off and on, all over." (Internal quotation marks omitted.) *Tragarz*, 980 F.2d at 414. No witness could name a specific job site at which Tragarz worked with or near Kaylo products. The *Tragarz* court summarized the testimony of other witnesses who said that "Tragarz was exposed to Kaylo asbestos products on more than one occasion," and "Kaylo \*\*\* was on the majority of sites [the witness] worked from the mid-1960s onward." *Tragarz*, 980 F.2d at 419.

¶ 32    The *Tragarz* court then applied the frequency, regularity, and proximity test to the evidence:

"[The] frequency, regularity, and proximity test is not a rigid test with an absolute threshold level necessary to support a jury verdict. \*\*\* [T]he frequency and regularity

- 8 -

prongs become less cumbersome when dealing with cases involving diseases, like mesothelioma, which can develop after only minor exposures to asbestos fibers. ***

*** This does not mean, however, that the frequency, regularity, and proximity test is irrelevant when determining whether the plaintiff has proved that the exposure to defendant's product was a substantial factor in causing the resulting disease. Rather, this simply means that these factors become somewhat less critical when a party puts forth direct evidence of exposure to a defendant's products.

Not only is the so-called frequency, regularity, and proximity test less vital in cases involving direct evidence, *** the frequency, regularity, and proximity test becomes even less rigid for purposes of proving substantial factor when dealing with cases in which exposure to asbestos causes mesothelioma. The *** reason for this diminished importance is that mesothelioma can result from minor exposures to asbestos products ***." *Tragarz*, 980 F.2d at 420-21.

¶ 33   The *Tragarz* court found the evidence sufficient to support a jury verdict in favor of Tragarz.

¶ 34   Here, Ronnie developed mesothelioma after repeated exposure to asbestos. Although Walter could not say how frequently he and Ronnie used Wel-Cote for their work in Illinois, he testified that they used it for some of their jobs; in the deleted portion of the evidence deposition, he testified that they used Bestwall and Wel-Cote more than other brands, while in the deposition shown at trial, he said only he "imagine[d]" they used Bestwall and Wel-Cote more. Because the estate's experts testified that relatively low levels of exposure contribute to causing mesothelioma, here, as in *Tragarz*, a jury could find the exposures to Wel-Cote in Illinois constituted a substantial factor in causing the injury.

¶ 35   The trial court heard Welco's argument about the frequency, regularity, and proximity test and watched Walter's evidence deposition before trial and found the evidence sufficient to present a genuine issue of material fact as to whether exposure to Wel-Cote constituted a substantial factor causing the injury. We see only one significant difference between the evidence presented with the motion for summary judgment and the evidence presented at trial. With no explanation in the record for the change, the video recording played at trial did not include Walter's testimony, "Wel-Cote and Bestwall was the most we used." We find the unexplained alteration insufficient to justify taking the question of causation from the jury.

¶ 36                                    Other Bases for Affirming the Judgment

¶ 37   Anticipating that this court might reject the trial court's application of the frequency, regularity, and proximity test, Welco has advanced three other bases for affirming the judgment entered in its favor. Welco argues (1) Alabama law should apply, (2) Welco had no duty to warn, and (3) the estate did not prove that Welco's chrysotile fibers caused injury.

¶ 38                                    *Choice of Law*

¶ 39   In general, "the local law of the State where the injury occurred should determine the rights and liabilities of the parties, unless [another state] has a more significant relationship with the occurrence and with the parties." *Ingersoll v. Klein*, 46 Ill. 2d 42, 45 (1970). That is, "a presumption exists, which may be overcome only by showing a *more* or *greater* significant

- 9 -

relationship to another state." (Emphasis in original.) *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 163 (2007).

¶ 40    To decide whether the circumstances overcome the presumption under the facts of a case, the court should consider:

" '(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.' " *Townsend*, 227 Ill. 2d at 160 (quoting Restatement (Second) of Conflict of Laws § 145(2), at 414 (1971)).

¶ 41    Welco emphasizes that Ronnie lived and worked almost all of his life in Alabama, and he used Wel-Cote in Alabama. Ronnie's treating physicians and his family all live in Alabama. However, the estate claimed damages only from the injuries inflicted while Ronnie worked with Wel-Cote in Illinois in 1965, when Ronnie and his family lived in Illinois. Because the injury at issue occurred in Illinois, *Ingersoll* establishes a presumption that Illinois law applies. The conduct that caused the injury included the shipment of Wel-Cote to Illinois, where Ronnie's employer put the product to its intended use. See *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 935 (Me. 1982). The parties' relationship at the time of injury centered in Illinois. See *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 437 (Mo. 1984). Applying the *Townsend* factors and in view of the *Ingersoll* presumption, we hold that the trial court correctly applied Illinois law to the litigation.

¶ 42                                    *Duty to Warn*

¶ 43    A plaintiff who seeks to recover from a manufacturer for failure to warn users of the dangers of a product must show that "the defendant manufacturer knew or should have known of the danger that caused the injury, and that the defendant manufacturer failed to warn plaintiff of that danger." *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 35 (1980). Dr. Lemen testified that scientists studied the dangers of asbestos dust in the 1920s and 1930s and, by the early 1960s, the United States Public Health Service had confirmed that inhaling asbestos dust caused several severe diseases. A trier of fact could infer that Welco, as a manufacturer of asbestos products, should have known of the dangers of inhaling asbestos dust before 1965. See *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195, 206-08 (1983). We find that the estate has presented sufficient evidence to withstand a motion for a directed verdict on the issue of whether Welco had a duty to warn Ronnie of the dangers of inhaling asbestos dust.

¶ 44                                *Danger of Chrysotile*

¶ 45    Finally, Welco focuses on a single statement from Dr. Mark, claiming that the testimony requires entry of a judgment in favor of Welco. In pretrial proceedings, one of Welco's codefendants presented a study that concluded that about two-thirds of the chrysotile from one specific mine broke down into fibers less than five microns in length before use in manufacturing. When asked the question, "Do you agree that fibers shorter tha[n] 5 microns in

length have not been proven to cause diffuse malignant mesothelioma?" Dr. Mark answered, "Essentially, yes. There is evidence to it, but I don't believe that the evidence is definitive."

¶ 46 We find that this testimony does not require the jury to ignore Dr. Mark's opinion that exposure to Welco's joint compound substantially contributed to Ronnie's development of diffuse malignant mesothelioma. Nor does Dr. Mark's testimony negate Dr. Lemen's and Dr. Brody's testimony that all forms of asbestos cause mesothelioma. Most significantly, Welco presented no evidence to rebut Dr. Mark's testimony that chrysotile fiber used in manufacturing lacks the purity of laboratory chrysotile and that chrysotile for manufacturing includes a mixture of about 2% to 10% of the more dangerous longer fibers. Moreover, Dr. Mark testified that experiments provide some evidence of a connection between short fiber asbestos and diffuse malignant mesothelioma. Welco cites no case or statute holding that plaintiffs cannot recover without definitive experimental proof of the causal relationship between a known hazard and a plaintiff's specific disease. We find the evidence of the danger of chrysotile, as used in manufacturing, sufficient to withstand Welco's motion for directed verdict.

¶ 47 CONCLUSION

¶ 48 Walter's testimony that he and Ronnie used Wel-Cote on jobs in Illinois was sufficient to create an issue of material fact as to whether exposure to Wel-Cote in Illinois constituted a substantial factor in causing Ronnie to contract mesothelioma. The trial court correctly applied Illinois law because the injury occurred in Illinois and no countervailing considerations overcame the presumption that Illinois law should apply. Dr. Lemen's testimony established that Welco had a duty to warn the persons who used its asbestos products of the dangers of inhaling asbestos dust. A finder of fact could rely on expert testimony concerning the link between all forms of asbestos and mesothelioma. Accordingly, we reverse the judgment entered in favor of Welco and remand for a new trial.

¶ 49 Reversed and remanded.