98 N.J. Super. 47 (1967)
236 A.2d 143
PHILOMENA BUDD, GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILLIAM J. BUDD, DECEASED, PLAINTIFF-RESPONDENT,
v.
ERIE LACKAWANNA RAILROAD COMPANY, A NEW YORK CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1967.
Decided November 24, 1967.
*50 Before Judges CONFORD, COLLESTER and LABRECQUE.
Mr. Arthur J. Blake argued the cause for appellant (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
Mr. Robert H. Wall argued the cause for respondent (Mr. Thomas J. Kilcoyne, on the brief).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendant Erie Lackawanna Railroad Company appeals from a judgment in favor of plaintiff based upon a jury verdict.
*51 Plaintiff sued under the Federal Employers' Liability Act (hereinafter FELA), 45 U.S.C.A. § 51 et seq., and was awarded $58,500 on her claim for her husband's death and $6,000 for his pain and suffering prior to death. Defendant appeals from the judgment thus rendered and from denial of its motion for a new trial.
Decedent, a resident of Hackensack, was employed as a clerk in defendant's 28th Street Station in New York City. On the afternoon of October 26, 1962, at about 1.30 P.M. and shortly after lunch, while attempting to assist another clerk with his work, he was seen by a fellow employee to nod his head forward, break into an extremely heavy sweat and lapse into unconsciousness. The employee came to his assistance and upon observing his condition requested one Muller, the chief clerk in charge, to call a physician or an ambulance. This was not done although the request was repeated "six or eight" times during the next 45 minutes. At the end of about 25 minutes decedent appeared to partially recover consciousness, but shortly thereafter lapsed into a coma. It was 45 minutes after the onset of his illness before he started to regain full consciousness. Muller continued to be present thereafter, but no medical assistance was ever summoned although defendant employed a company physician and there was a public hospital some four blocks away. It was not until later, after decedent had vomited several times, that another executive directed a fellow employee to drive decedent home. This was some two hours after the onset of his illness. At decedent's request he was first driven to the Hackensack office of a Dr. Kristal, his personal physician, arriving there at about 4 P.M. He died approximately 15 minutes later. The cause of death was given as coronary occlusion.
Dr. Kristal's office was about 40 minutes from decedent's place of employment. He testified that decedent had called him before coming to his office, and when decedent related his symptoms he advised him that if he felt "that bad" he should see a doctor in that area immediately.
*52 Plaintiff's cause of action was buttressed upon the "humane instincts doctrine" set forth in Szabo v. Pennsylvania Railroad Co., 132 N.J.L. 331, 332-333 (E. & A. 1945), it being alleged that defendant failed in its duty to furnish medical care and attention when decedent became acutely ill while on the job. See also Dudley v. Victor Lynn Lines, Inc., 32 N.J. 479, 493-495 (1960); compare Burns v. Bakelite Corp., 17 N.J. Super. 441 (App. Div. 1952), certification denied 9 N.J. 335 (1952). Defendant denied violation of any duty owing to decedent and set up his own contributory negligence as a bar. In arriving at its verdict the jury applied the doctrine of comparative negligence prescribed by FELA, 45 U.S.C.A. § 53, and found decedent to have been contributorily negligent to the extent of 25%. Thus the verdict rendered amounted to 75% of the sums which the jury found to represent the actual damages sustained by plaintiff.
Defendant first urges that the trial judge committed reversible error in admitting and submitting to the jury the life expectancy tables contained in the rules of court. It argues that such tables show average life expectancy only and were inapplicable in view of decedent's allegedly reduced life expectancy due to the heart attack he sustained before the occurrence of defendant's alleged negligence.
R.R. 4:45A provides that the tables of mortality and life expectancy as set forth in the appendix to the rules shall be admissible in evidence as prima facie proof of the facts contained therein. The table of life expectancy referred to indicates average life expectancy and is based upon the so-called United States Life Tables, 1959-61, as published by the United States Department of Health, Education and Welfare in December 1964. The tables of mortality which precede it in the rules furnish the present value of an annuity of $1, at 3 1/2% interest based upon the same table of life expectancy. Prior to adoption of the present rules a somewhat similar table of mortality was contained in former Chancery Rule 184. In general, such tables, or testimony *53 based thereon, have been held to be admissible in actions by personal representatives for wrongful death, Camden and Atlantic R.R. Co. v. Williams, 61 N.J.L. 646 (E. & A. 1898), and in suits for personal injuries where the evidence supports the contention that the claimed injuries are of a permanent nature. Dalton v. Gesser, 72 N.J. Super. 100, 116-117 (App. Div. 1962); Kappovich v. LeWinter, 43 N.J. Super. 528, 532-533 (App. Div. 1957), certification denied 24 N.J. 112 (1957).
Specifically, defendant urges that since the original heart attack suffered by decedent was not work-connected and his life expectancy was materially reduced thereby, it was error to permit the jury to use a table of average life expectancy in arriving at the amount of its verdict. It cites several cases from other jurisdictions which appear to so hold.
We are satisfied that the table was properly received in evidence regardless of what decedent's condition of health would have been had medical care been furnished so that he had survived the heart attack which overcame him on the day in question. Under our cases the use of such tables is not limited to instances where the deceased enjoys average or better health. In Camden and Atlantic R.R. Co. v. Williams, supra, 61 N.J.L., at p. 649, referring to the Carlisle Table of Mortality (from which was derived the table of mortality contained in former Chancery Rule 184) it was held:
"It [the table of mortality] was legal evidence irrespective of the condition of health of the deceased, for it is not a table compiled from statistics of selected lives only, but of course such condition had to be taken into account, and testimony on that subject was in fact taken by both parties. The table was not admitted as controlling. The judge said, `We are not bound by it,' and in his charge to the jury he very clearly and correctly stated the rules governing the estimate of probable duration of life to be made by a jury in awarding damages in cases of injury resulting in death."
And in Auer v. Sinclair Refining Co., 103 N.J.L. 372 (E. & A. 1927) it was held:
*54 "The general rule is that, while the Carlisle table of mortality is evidential, irrespective of the condition of health of the person whose expectancy of life is the subject of the inquiry, yet that condition of health must be taken into account in determining the probable duration of such person's life. * * *" (at p. 375)
It thus appears that when accompanied by cautionary instructions, the table may be used regardless of decedent's state of health. Our examination of the charge here convinces us that the jury was properly and adequately instructed as to the inconclusive import of the table and the limited use which the jury might make of it. Kappovich v. LeWinter, supra, 43 N.J. Super., at p. 533; Dickerson v. Mutual Grocery Co., 100 N.J.L. 118, 121-123 (E. & A. 1924); Hampton v. Pennsylvania R.R. Co., 115 N.J.L. 168, 170-171 (E. & A. 1935).
While we have not considered it in determining the issue, we note that plaintiff's cardiologist testified that in heart attacks of the type here involved, 25% die instantly regardless of whether they receive medical care; of the remainder, 25% die within the next three to five days; the mortality rate for myocardial infarction per se would be virtually zero for the survivors.
By its second point defendant challenges the admission into evidence of a portion of section 5 of rule 51 of the provisions of the contract between decedent's union and defendant. In substance, it urges that the ruling introduced a new issue into the case and imposed a greater duty upon it than the law required. As to this we determine that the issue was not thereby changed from one of negligence to one of breach of contract, the provision in question was relevant as within the framework of the issues presented, and, in any event, defendant suffered no prejudice thereby.
The provision in question recited that employees who became ill on the job should be "given medical attention at the earliest possible moment." It would ordinarily be considered as one of the work rules governing decedent's employment. Such work rules are generally held to be relevant *55 on an issue of negligence. A duty thus undertaken must be performed with due care. In general, it was admissible here as some evidence that defendant had undertaken to furnish medical care to clerical employees upon their being taken ill, and as a practical indication as to what the parties jointly deemed to be the appropriate care due. In Bascho v. Pennsylvania Railroad Co., 3 N.J. Super. 86, 92 (App. Div. 1949), a negligence case where one of the issues was whether the company had undertaken to furnish medical care to a locomotive fireman, we held that the company's rules which required the furnishing of first aid and medical care to employees injured on company property were admissible. While that case involved an injury which had been sustained in the line of the employee's duty, the action was brought under the Federal Employers' Liability Act and the issue did not turn upon whether the initial injury was work-connected.
Wholly aside from the foregoing, we are satisfied that defendant suffered no prejudice by reason of the ruling. The rule laid down in Szabo v. Pennsylvania Railroad Co., supra, provided that:
"[W]here one, engaged in the work of his master receives injuries, whether or not due to the negligence of the master, rendering him helpless to provide for his own care, dictates of humanity, duty and fair dealing, require that the master put in the reach of such stricken employee such medical care and other assistance as the emergency, thus created, may in reason require, so that the stricken employee may have his life saved or may avoid further bodily harm. This duty arises out of strict necessity and urgent exigency. It arises with the emergency and expires with it.
This precept probably had its inception in the code of moral conduct, but, like many others, such as furnishing the employee with a safe place in which to work, and proper tools with which to labor, has become a legal duty incorporated in every contract of hiring, by legal inference, notwithstanding a lack of specific provision or statutory requirement * * *." (at pp. 332-333; emphasis added)
Both plaintiff's complaint and pretrial order charged negligence in the failure of defendant to conform to the duty thus *56 imposed by omitting to furnish medical care to decedent when he was, to the knowledge of his superior, in the throes of a severe attack of illness. This was the sole theory on which the case was tried and submitted to the jury. In the portion of the charge bearing on the issue of negligence, defendant's duty of care was set forth in terms of the duty imposed by Szabo, so that the jury was confined to determining (1) whether decedent became sufficiently ill to render him incapable of taking care of himself, and (2) whether in the emergency thus created his employer had negligently failed to furnish such reasonable medical care as the situation required.
In the circumstances here presented we are satisfied that defendant's obligation would have been the same regardless of whether the duty was the implied one referred to in Szabo or the express one set forth in the labor contract. The duty which devolved upon defendant to furnish medical care "at the earliest possible moment" would not arise until notice of an employee's illness was brought home to his employer. Here the proofs were plenary that immediately upon his becoming ill decedent lapsed into unconsciousness, his condition was apparent to his superior and fellow employees and there was an immediate request that medical aid be summoned. It can hardly be denied that in the exigencies of the situation thus presented medical attention at the earliest possible moment was called for. We are therefore satisfied that admission of the challenged testimony played no material part in the jury's verdict. The result would undoubtedly have been the same, even if considered solely from the standpoint of the duty owing under the Szabo rule. Cf. Bascho v. Pennsylvania Railroad Co., supra, at p. 92; Wendell v. Pennsylvania Railroad Co., 57 N.J.L. 467 (Sup. Ct. 1895); Blanchard v. Vermont Shade Roller Co., 84 Vt. 442, 79 A. 911 (Sup. Ct. 1911).
Defendant next urges that plaintiff's proofs as to causation were deficient in that they failed to establish a prima facie basis for a finding that decedent's death proximately *57 resulted from defendant's asserted negligence. In its argument it relies upon Cowdrick v. Pennsylvania Railroad Co., 132 N.J.L. 131 (E. & A. 1944), certiorari denied 323 U.S. 799, 65 S.Ct. 555, 89 L.Ed. 637 (1945); Atchison, Topeka & Santa Fe Railway Co. v. Toops, 281 U.S. 351, 355, 50 S.Ct. 281, 74 L.Ed. 896 (1930), and St. Louis, I.M. & S.R. Co. v. Allen, 86 Ark. 465, 111 S.W. 802 (Sup. Ct. 1908), as imposing the traditional common law concept of proximate cause in cases arising under the Federal Employers' Liability Act. But the quantum of proof as to causation in cases arising under the act is no longer measured by the cited cases but by the standards set forth in Rogers v. Missouri Pac. Ry. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). In that case it was held:
"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due `in whole or in part' to its negligence. (Emphasis added.)
The law was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make *58 that inference." (352 U.S., at pp. 506-508, 77 S.Ct., at p. 448; emphasis added)
Cf. DeLima v. Trinidad Corporation, 302 F.2d 585, 587-588 (2 Cir. 1962); Perion v. United Fruit Company, 226 Md. 591, 174 A.2d 777, 781-83 (Ct. App. 1961).
The trial judge determined, and we agree, that measured by this test the circumstances were sufficient to support a finding that had prompt medical attention been given to decedent his life would not have been terminated at the time it was. As noted, plaintiff's cardiologist testified that 25% of those who survived the initial attack would die within the next three to five days, whereas the mortality for myocardial infarctions per se of the 75% comprising the remainder of the group would be "virtually zero." He was of the opinion that the delay in furnishing treatment was injurious to decedent, contributed to the aggravation of his condition and worsened his prognosis. If his testimony was to be believed, decedent, having survived the initial attack, had a 75% chance of survival so far as his infarction was concerned. While there was contradictory testimony, the judge was required to consider the proofs in the light most favorable to plaintiff. In order for the jury to find for plaintiff it was not necessary that she also adduce direct proof that if decedent had received prompt medical treatment he would have been among the fortunate 75% who would have survived. Under the proofs here it was sufficient that they could have so found as a matter of the preponderance of the probabilities.
Defendant next challenges the denial of its motion for a new trial urging that the awards made by the jury were so excessive as to indicate that they were the product of mistake, partiality, prejudice or passion. In connection with our consideration of this point, we note that the verdict for $6,000 for pre-death pain and suffering presupposed a finding of $8,000 and that the verdictof $58,500 was necessarily based upon a finding that the present value of the *59 pecuniary benefits of which decedent's next-of-kin were deprived by reason of his wrongful death was $78,000.
The trial judge found that the proofs were adequate to sustain the jury's verdict as to liability. We concur. As to defendant's claim of excessiveness, it accorded recognition to the doctrine that courts will interfere with a verdict on that ground only with reluctance and never except in a clear case. Cabakov v. Thatcher, 37 N.J. Super. 249, 257 (App. Div. 1955). A trial judge may not substitute his judgment for that of the jury, and from the fact that an award may appear excessive to him, it does not necessarily follow that a judgment based thereon is the product of mistake, partiality, prejudice or passion. Andryishyn v. Ballinger, 61 N.J. Super. 386, 395 (App. Div. 1960), certification denied 33 N.J. 120 (1960); Cabakov v. Thatcher, supra, at p. 258. If reasonable minds may accept the evidence as adequate to support the verdict, it may not be disturbed. Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962). Where, however, it is so excessive as irresistibly to give rise to the inference that it was the result of passion, partiality, prejudice or mistake, it becomes the duty of the court to intervene. Hager v. Weber, 7 N.J. 201, 210-213 (1951); Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381, 406 (App. Div. 1962), certification denied 38 N.J. 183 (1962).
Considering the limited scope of review allowed under Kulbacki, and having due regard to the opportunity of the trial judge to see the witnesses and judge of their credibility, Hartpence v. Grouleff, 15 N.J. 545 (1954), we hold that denial of defendant's motion for a new trial did not amount to a manifest denial of justice under the law. On the basis of the testimony the jury could have determined that the pain which followed the failure of defendant's supervisor to call a doctor after the onset of decedent's heart attack, was excruciating in the extreme. Had medical attention been furnished it is hardly to be doubted that medical procedures would have eased the pain. Here the determination of the *60 amount to be awarded was one particularly suited for a jury's determination. There is no exact rule by which damages of the type indicated may be measured, Botta v. Brunner, 26 N.J. 82, 95-96 (1958)  or on which we may rely if we are to hold that it was error to decline to set aside or reduce the verdict rendered.
As to the sum awarded for the wrongful death of decedent, there was proof from which the jury could have found that his annual salary from defendant amounted, in round figures, to $6,700. In addition, he earned $300 a year as an agent for the union to which he belonged. There was testimony from which the jury could have concluded that had he lived he would have received increments which totalled approximately $500 to the date of trial, with the prospect of further increases in salary under future contracts between defendant and the union. Decedent was 47 years old at the time of his death. He was married and had two children, one married and the other a junior in high school. There was testimony that notwithstanding the marriage of the elder daughter, decedent had continued to make contributions to her. It was for the jury to determine the extent of decedent's contributions to his wife and family and, based upon his expectation of life and the proofs in the case, to measure the present value of the pecuniary benefits of which the next-of-kin had been deprived. We cannot say that the trial judge erred in holding that the amounts awarded were not so excessive as clearly and convincingly to indicate that they were the result of mistake, partiality, prejudice or passion.
Affirmed.