295 N.J. Super. 565 (1996)
685 A.2d 950
CELINDA CREGO, PLAINTIFF-APPELLANT,
v.
LEWIS CARP, D.O. AND JOHN K. MARIANI, D.O., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 1996.
Decided December 10, 1996.
*568 Before Judges MICHELS, KLEINER and COBURN.
Jeffrey M. Keiser argued the cause for appellant.
Christopher J. Christie argued the cause for respondent Lewis Carp, D.O. (Dughi and Hewit, attorneys; Mr. Christie, of counsel and on the brief).
Robert E. Paarz argued the cause for respondent John K. Mariani, D.O. (Paarz, Master & Koernig, attorneys; Mr. Paarz, of counsel; Mary Ann C. O'Brien, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Celinda Crego appeals from an order of the Law Division that denied her motion for a judgment against defendants Lewis Carp, D.O. (Dr. Carp) and John K. Mariani, D.O. (Dr. Mariani) notwithstanding the verdict entered in their favor, or alternatively, for a new trial in this medical malpractice action.
On May 1, 1988, plaintiff sustained an injury to her ankle in a volleyball game while at a picnic. Plaintiff felt there was something wrong with her ankle and immediately iced her ankle and later elevated her leg at home. The next day, May 2, 1988, plaintiff went to work despite pain and swelling of the ankle. Three days later, May 5, 1988, plaintiff saw the company nurse *569 who wrapped plaintiff's ankle in an ace bandage and recommended that she seek the care of a physician. Later that day, plaintiff went to Dr. Carp, her family physician.
Dr. Carp, a board certified family practitioner, examined and x-rayed plaintiff's leg. Although the doctor palpated the back of plaintiff's foot and her Achilles tendon, he did not perform a Thompson test, a diagnostic test designed to detect injury to the Achilles tendon, because he did not believe that such a test was indicated by the nature of plaintiff's injury. Dr. Carp diagnosed plaintiff as having a sprained ankle and treated the injury with a Gibney boot to immobilize plaintiff's ankle. Dr. Carp estimated that it would take approximately six weeks for plaintiff's ankle to improve and advised plaintiff to return in one week.
On May 11, 1988, plaintiff returned to Dr. Carp's office. Since Dr. Carp was not available, plaintiff was seen by his associate, Dr. Saul Rose, also a family practitioner. On June 2, 1988, plaintiff again visited Dr. Carp, complaining of tenderness in the ankle. Dr. Carp recommended more aggressive treatment, prescribed Motrin for pain and to reduce the inflammation of plaintiff's ankle, and prescribed whirlpool treatment to increase circulation as well as to reduce the inflammation. Plaintiff was treated on six occasions between June 3, 1988, and June 15, 1988, by Mr. Herbert Laskin, a licensed physical therapist whom plaintiff had been referred to for the whirlpool treatment. Mr. Laskin palpated plaintiff's Achilles tendon and was of the opinion that plaintiff had a potential Achilles tendon injury. On June 16, 1988, plaintiff visited Dr. Carp and informed him that her pain had improved. However, because plaintiff's injury had not completely healed, Dr. Carp recommended an injection of cortisone. Plaintiff refused the injection. On June 30, 1988, plaintiff returned to Dr. Carp, still complaining of pain. Because of the lack of significant progress or improvement, Dr. Carp recommended that plaintiff consult an orthopedic surgeon and referred plaintiff to Dr. Mariani.
On July 6, 1988, plaintiff visited Dr. Mariani, who diagnosed plaintiff with a healing sprained ankle and asked plaintiff to return *570 in six weeks for a follow-up evaluation. On August 8, 1988, plaintiff returned to Dr. Mariani because she still had pain in the ankle. Dr. Mariani performed a Thompson diagnostic test upon plaintiff's Achilles tendon. Although the results were not consistent with a complete ruptured Achilles tendon, Dr. Mariani was of the opinion that plaintiff had a partial tear of the Achilles tendon and immobilized plaintiff's ankle in a short leg cast and asked plaintiff to return in four weeks. On September 7, 1988, plaintiff returned to Dr. Mariani as requested. Dr. Mariani performed another Thompson test which was negative.
Unsatisfied with Dr. Mariani's explanation of her injury, plaintiff sought a second opinion from Dr. Arthur Bartolozzi, an orthopedic surgeon at the Rothman Institute in Philadelphia. On October 27, 1988, Dr. Bartolozzi diagnosed plaintiff as having a ruptured Achilles tendon and prescribed a program of physical therapy. According to plaintiff, Dr. Bartolozzi told her at his first examination that the time frame of her best chance for successful surgery was the first two weeks after the injury. Sometime between four and six months thereafter, plaintiff returned to Dr. Bartolozzi who referred plaintiff to Dr. Frederick C. Balduini for another opinion on surgery.
On March 9, 1989, plaintiff visited Dr. Balduini, who suggested an aggressive physical therapy regimen rather than surgery. However, because of a lack of improvement following the physical therapy, Dr. Balduini recommended reconstructive surgery. On June 14, 1989, Dr. Balduini performed the surgery at the Graduate Hospital in Philadelphia. Thereafter, plaintiff underwent more physical therapy and rehabilitation. After more than one year of such therapy and rehabilitation and even though plaintiff had less pain and obtained some improvement in her function, she still continued to have pain, discomfort, disability and loss of function.
Subsequently, plaintiff consulted Dr. Martin O'Malley in New York, who recommended that she consult Dr. Keith L. Wapner, an orthopedic surgeon, with a subspecialty in foot and ankle surgery. *571 On January 26, 1994, Dr. Wapner performed tendon transplant surgery upon plaintiff at Jefferson Hospital in Philadelphia.
Plaintiff instituted this action against Drs. Carp and Mariani, claiming that they were guilty of medical malpractice. Plaintiff charged that Drs. Carp and Mariani deviated from accepted standards of medical care by failing to timely diagnose and treat an Achilles tendon rupture. Following a lengthy trial, the jury found in answers to special interrogatories that (1) Dr. Carp did not deviate from accepted standards of medical practice; (2) Dr. Mariani deviated from accepted standards of medical practice and (3) Dr. Mariani's deviation from accepted standards of medical practice increased the risk of harm posed by plaintiff's preexisting condition; but (4) Dr. Mariani's deviation, which had increased the risk, was not a substantial factor in producing the ultimate injury sustained by plaintiff. The trial court thereupon molded the jury verdict and entered judgment of no cause for action in favor of Dr. Carp and Mariani. Plaintiff's motions for a judgment notwithstanding the verdict against both doctors or, alternatively, a new trial were denied and this appeal followed.
Plaintiff seeks a reversal of the order denying her motions for a judgment notwithstanding the verdict or, alternatively, a new trial. She contends generally that the evidence mandates that a judgment be entered in her favor and that the errors of law, at the very least, required a new trial with appropriate instructions as to the legal issues presented by the case. More specifically, plaintiff contends that (1) the use of the so-called "judgment" charge by the trial court was erroneous and misled the jury to an incorrect result; (2) the trial court erred in instructing the jury that Dr. Carp should be held to the standard of care of a general practitioner where, as here, he had undertaken to treat an injury that is generally treated by an orthopedic specialist; (3) Doctors Carp and Mariani should not have been permitted to withdraw and substitute experts and that she should not have been precluded from cross-examining the substituted experts regarding the inconsistent opinions of the withdrawn experts; (4) the trial court's *572 charge was in error with respect to the definition of a "substantial factor" and the doctors' duty to make a diagnosis; (5) the doctors' argument that there was negligence on behalf of the therapist was improper and that the argument, together with the trial court's inadequate instructions, contributed to the incorrect result; (6) the trial court erred by not granting her motion for a judgment notwithstanding the verdict or, alternatively, a new trial as the verdict was clearly against the weight of the evidence; and finally, (7) the trial court's failure to give instructions regarding the probable negative influence of radio, television and print advertisement and commentary and a proper ruling on the collateral source rule and the multiple evidence rulings impacted upon her right to a fair trial.
We are satisfied from our study of the record and the arguments presented that the evidence in support of the jury verdict is not insufficient; that the determination of the trial court on plaintiff's motions for judgment notwithstanding the verdict or, alternatively, for a new trial does not constitute a manifest denial of justice; and that all of the issues of law raised are clearly without merit. R. 2:11-3(e)(1)(B),(C) and (E). However, further comment is appropriate with respect to some of plaintiff's arguments.

I.
Plaintiff contends essentially that the trial court erred by including in its instructions to the jury the so-called "judgment" charge, which is part of the Model Jury Charge on medical malpractice. Plaintiff argues that the charge is an incorrect statement of New Jersey law and prejudiced her ability to receive a fair trial. We disagree. The precise portion of the charge which plaintiff challenges on this appeal reads as follows:
Now in examining the conduct of a physician to determine whether there was a deviation from an accepted standard of care, that is whether he was negligent, you should understand that the law does recognize that the practice of medicine is not an exact science. Therefore, the law recognizes that the practice of medicine according to acceptable medical standards will not prevent a poor or unanticipated *573 result. If a physician has applied the required knowledge, the required skill and care in a diagnosis and treatment of a patient he is not negligent simply because a bad result has occurred. Likewise, where according to accepted medical practice the manner in which diagnosis and/or treatment is conducted is a matter subject to the judgment of the physician. The physician must be allowed to exercise that judgment. The physician cannot be held liable if in the exercise of judgment he has never the less made a mistake. Where judgment must be exercised, the law does not require of the doctor infallible judgment. Thus, a physician cannot be found negligent so long as he employs such judgment as is allowed by accepted medical standards. If in fact in the exercise of his judgment a doctor selects one of two or more courses of action, each of which in the circumstances has substantial support or proper practice by the medical profession, the doctor cannot be found negligent if the course chosen produces a poor result. On the other hand, a doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself from the consequences by saying that it was an exercise of his judgment. Or, to state in a different way, if the exercise of a doctor's judgment causes him to do that which standard medical practice forbids, the doctor would be negligent. Similarly, a doctor whose judgment causes him to omit doing something which is required by standard medical practice is also negligent.
It is interesting to note that plaintiff raised no objection to the so-called "judgment" charge at the charge conference and only objected after the charge was given to the jury.
The standard for assessing "the soundness of instructions is, not what the ingenuity of counsel can, at leisure, work out the instructions to mean, but how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary men and jurors understand the instructions as a whole." Davidson v. Fornicola, 38 N.J. Super. 365, 371, 118 A.2d 838 (App.Div. 1955) (citing Kargman v. Carlo, 85 N.J.L. 632, 90 A. 292 (E. & A. 1914)), certif. denied, 20 N.J. 467, 120 A.2d 275 (1956); see State v. Marshall, 123 N.J. 1, 135, 586 A.2d 85 (1991); see also Eden v. Conrail, 175 N.J. Super. 263, 278, 418 A.2d 278 (App.Div. 1980), modified, 87 N.J. 467, 435 A.2d 556 (1981). As stated by the New Jersey Supreme Court, "[s]ufficiency of a charge ... should be measured by determining whether or not jurors, in light of all the facts, would misunderstand or be confused." Board of Educ. of Asbury Park v. Hoek, 38 N.J. 213, 228, 183 A.2d 633 (1962).
*574 It also is firmly settled in this State that "[t]he science of medicine is not an exact science." Clark v. Wichman, 72 N.J. Super. 486, 495, 179 A.2d 38 (App.Div. 1962). "A doctor is not an insurer of his patient's recovery. He is not a guarantor." Ibid. (citing Young v. Stevens, 132 N.J.L. 124, 129, 39 A.2d 115 (E. & A. 1944)). "He is not liable for honest mistakes of judgment." Ibid. In Schueler v. Strelinger, 43 N.J. 330, 344-45, 204 A.2d 577 (1964) (citations omitted), our Supreme Court set forth in clear and precise language the standard of care that is owed by a physician, stating:
[t]he fact that a good result may occur with poor treatment, and that a good treatment will not necessarily prevent a poor result must be recognized. So, if the doctor has brought the requisite degree of care and skill to his patient, he is not liable simply because of failure to cure or for bad results that may follow. Nor in such case is he liable for an honest mistake in diagnosis or in judgment as to the course of treatment taken. A physician must be allowed a wide range in the reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that judgment does not represent a departure from the requirements of accepted medical practice, or does not result in failure to do something accepted medical practice obligates him to do, or in the doing of something he should not do measured by the standard stated above.
It is important to emphasize the basic principle that the practice of medicine
imposes upon [the doctor] the duty to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in [the] field. Failure to have and to use such skill and care toward the patient as a result of which injury or damage results constitutes negligence.
[Id. at 344, 204 A.2d 577.]
And, of course, the plaintiff bears the burden of establishing the doctor's deviation from the medical standard. See id. at 345, 204 A.2d 577. See also Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981).
The charge, including the language of the so-called "judgment" charge, when read in its entirety, correctly instructed the jury as to the applicable law of New Jersey dealing with medical malpractice cases, including the duty that a physician owes to his or her patient in a case of this kind. The charge was delivered in clear and explicit language and properly defined the duty of care that *575 Dr. Carp and Dr. Mariani, respectively, owed to plaintiff. The charge was neither misleading nor confusing. It did not dilute in any respect the doctors' duty to conform to the applicable accepted standards of medical practice in treating plaintiff. As a matter of fact, the charge tracked the Model Jury Charge on Medical Malpractice, see Model Jury Charge, § 5.36A (Civil Charge) Medical Malpractice, Duty and Negligence (October 1982), which is consistent with and controlled by the principles enunciated by our Supreme Court in Schueler v. Strelinger, supra. See also Walck v. Johns-Manville Products Corp., 56 N.J. 533, 562, 267 A.2d 508 (1970); Ely v. Wilbur, 49 N.J.L. 685, 688, 10 A. 441 (E. & A. 1887). But see Morlino v. Medical Center of Ocean County, 295 N.J. Super. 113, 684 A.2d 944 (App.Div. 1996). In our view, there is no judicial warrant or sound reason for us to depart from the Model Jury Charge on Medical Malpractice, including the so-called "judgment" charge.
Finally, we point out that the charge clearly addressed plaintiff's concerns that "a doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself from the consequences by saying that it was an exercise of his judgment." Under the charge in this case, the treatment of the concepts of (1) deviations from the standard of care, (2) a doctor's exercise of judgment and (3) the skill and knowledge level of practitioners in the field, are not unrelated and sequential, as plaintiff claims, setting multiple burdens for plaintiffs which protect defendant doctors. Rather, the charge accurately ties these concepts together and plainly instructs that a doctor may exercise his judgment in a case, but that his exercise of such judgment is bounded by the skill and knowledge level of similar practitioners in his field. The charge also instructs that where a doctor makes a judgment which deviates from the accepted standards of skill and knowledge for practitioners in the field, the doctor is guilty of medical malpractice.
Consequently, we are thoroughly satisfied that the medical malpractice charge, including the so-called "judgment" charge, *576 given in this case was legally correct, entirely warranted and had no capacity whatsoever to confuse the jury as to the standard of care required of Dr. Carp and Dr. Mariani in their treatment of plaintiff.

II.
Plaintiff also claims that the trial court erred by instructing the jury regarding the duty of care owed by Dr. Carp to plaintiff because it held Dr. Carp to the standard of care of a general practitioner and not a specialist. Plaintiff argues that Dr. Carp should have been held to the standard of care of an orthopedic specialist because he "routinely treated people who suffered orthopedic injuries resulting from accidents." Again, we disagree.
The trial court instructed the jury concerning the standard of care to which Dr. Carp was held in this case as follows:
Now the defendant Doctor Carp in this case is a general practitioner. A person who is engaged in the general practice of medicine represents that he possesses and will have and employ the knowledge and skill normally possessed and used by the average physician practicing his profession as a general practitioner.
This charge conformed to the Model Jury Charge dealing with a general practitioner. See Model Jury Charge § 5.36A (Civil Charge) Medical Malpractice, Duty and Negligence, Option B: General Practitioner (October 1982).
The law is firmly settled in this State as to when a physician should be held to the standard of care of a general practitioner and it turns on the concept of holding oneself out as a specialist. For example, in Lewis v. Read, 80 N.J. Super. 148, 171, 193 A.2d 255 (App.Div.), certif. granted, 41 N.J. 121, 195 A.2d 17 (1963) we stated:
[I]t is settled beyond question that "one who holds himself out as a specialist must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge." Carbone v. Warburton, 22 N.J. Super. 5, 9, 91 A.2d 518 (App.Div. 1952), approvingly quoted by our Supreme Court in Carbone v. Warburton, supra, (11 N.J. [418] at page 426 [94 A.2d 680 (1953)]).
*577 See also Clark v. Wichman, supra, 72 N.J. Super. at 493, 179 A.2d 38; Coleman v. Wilson, 85 N.J.L. 203, 207, 88 A. 1059 (E. & A. 1913).
Dr. Carp was a board certified family practitioner  a general practitioner  not an orthopedic specialist. He did not hold himself out as an orthopedic specialist. There is no evidence or even suggestion in the record that Dr. Carp presented himself to plaintiff as a specialist in orthopedic injuries or surgery or even that plaintiff was led to believe that Dr. Carp was a specialist in orthopedics. On the contrary, the uncontroverted proof established that Dr. Carp was known to plaintiff as a general practitioner and as her "family doctor" and that he held himself out as such.
Thus, the trial court properly instructed the jury concerning the accepted standard of medical practice that Dr. Carp owed to plaintiff in this case.

III.
Finally, we are satisfied from our review of the record that the verdict was not against the weight of the evidence and, therefore, the trial court properly denied plaintiff's motion for a new trial.
It is settled that a trial court may grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). In Dolson v. Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969), the Supreme Court described the process the trial court is to undertake in evaluating a motion for a new trial stating:
A process of evidence evaluation,  "weighing" , is involved, which is hard indeed to express in words. This is not a pro forma exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury.
Furthermore, jury verdicts should be set aside in favor of new trials only with reluctance and then only in the cases of clear injustice. See Goss v. American Cyanamid, Co., 278 N.J. Super. 227, 239, 650 A.2d 1001 (App.Div. 1994). See also Fritsche v. *578 Westinghouse Elec. Corp., 55 N.J. 322, 330, 261 A.2d 657 (1970); Hacker v. Statman, 105 N.J. Super. 385, 395, 252 A.2d 406 (App. Div.), certif. denied, 54 N.J. 245, 254 A.2d 791 (1969); Budd v. Erie Lackawanna R.R. Co., 98 N.J. Super. 47, 59, 236 A.2d 143 (App.Div. 1967), certif. denied, 51 N.J. 186, 238 A.2d 472 (1968); Cabakov v. Thatcher, 37 N.J. Super. 249, 257, 117 A.2d 298 (App. Div. 1955).
"The standard for our setting aside a verdict already sustained by the trial judge is high." Horn v. Village Supermarkets, Inc., 260 N.J. Super. 165, 178, 615 A.2d 663 (App.Div. 1992), certif. denied, 133 N.J. 435, 627 A.2d 1141 (1993). "Only when upon examination the verdict is found to be so contrary to the weight of the evidence as to give rise to the inescapable conclusion that it is the result of mistake, passion, prejudice or partiality, may it be disturbed." Aiello v. Myzie, 88 N.J. Super. 187, 194, 211 A.2d 380 (App.Div.), certif. denied, 45 N.J. 594, 214 A.2d 30 (1965).
Kulbacki v. Sobchinsky, 38 N.J. 435, 444-45, 185 A.2d 835 (1962), also makes clear that because reasonable people may disagree about inferences which may be drawn from common facts, neither a trial judge nor an appellate court may reweigh the evidence and impose a new verdict simply because they disagree with the jury's decision. See also Battista v. Olson, 213 N.J. Super. 137, 142, 516 A.2d 1117 (App.Div. 1986); Amaru v. Stratton, 209 N.J. Super. 1, 20-21, 506 A.2d 1225 (App.Div. 1985); Hacker v. Statman, supra, 105 N.J. Super. at 395, 252 A.2d 406. Further, "since its scope of review [on a new trial motion] has ... inherent limitations, an appellate court must make allowance for factors which were evident to the trial court and jury but which cannot be gleaned from the written record." Fritsche v. Westinghouse Elec. Corp., supra, 55 N.J. at 330, 261 A.2d 657 (citations omitted). Finally, the verdict must be considered in the light most favorable to the prevailing party. See Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971) (citation omitted).
Armed with these principles, we have no hesitation in finding from our review of the record that the jury's verdict was not a *579 miscarriage of justice under the law. On the contrary, there was sufficient credible evidence present in the record as a whole to support all aspects of the jury's verdict.
Turning first to the verdict in favor of Dr. Carp, the jury found that Dr. Carp did not deviate from the accepted medical standard of care required of him in treating plaintiff. Dr. David Smith, M.D., plaintiff's liability expert, was of the opinion that Dr. Carp should have been able to make the diagnosis of her Achilles tendon rupture "over the period of time that he examined her, ... before he finally referred her away at the end of June." In Dr. Smith's opinion, Dr. Carp's failure to do so was a deviation from accepted standards of medical practice. However, Dr. Smith's opinion was undercut to some degree by other portions of his testimony which reasonably could be interpreted or construed to suggest that Dr. Carp was not necessarily negligent in his diagnosis of plaintiff's ankle injury. For example, Dr. Smith, in part, also testified that:
I certainly think that all of those findings would be compatible with an Achilles tendon tear and that would be on your list of the things that you're going to consider now. Now some of those things might be with an ankle sprain or whatever. And I think that it's important to recognize that we're not saying  I don't think any orthopedic surgeon says that you've got to be the genius on every occasion and that you could never miss a diagnosis; you look at everything, you sort it out as best you can. But there are certain things that are definite tipoffs and you've got to perform the accurate examination.
Now, if all of those things are related to an ankle sprain, then you still ought to be able to stand on your toe with an ankle sprain. You certainly ought to be able to feel that the Achilles tendon is intact with an ankle sprain. And so I am saying that when you come in, a lot of times the first evaluation may be somewhat confusing and so you're not expected to make the diagnosis always. And we all miss that from time to time.

[Emphasis added.]
Additionally, on cross-examination Dr. Smith admitted that it was not a deviation from medical standards for Dr. Carp not to have made a diagnosis of an Achilles tendon rupture on plaintiff's first visit to him on May 5, 1988. Dr. Smith also admitted on cross-examination that on Dr. Mariani's first examination in July 1988, it was still not a deviation from medical standards to have *580 failed to diagnose the ruptured Achilles tendon and to have accepted the sprained ankle diagnosis.
In contradiction of plaintiff's medical experts' opinions, there was testimony from competent medical experts that Dr. Carp did not deviate from accepted standards of medical care in treating plaintiff. For example, Dr. Harvey L. Kaufman, Dr. Carp's medical expert, was of the opinion that (1) the symptoms presented to Dr. Carp were consistent with a sprained ankle; (2) a Thompson Test of plaintiff's Achilles tendon was not indicated; (3) Dr. Carp complied with accepted standards of medical practice with respect to each of plaintiff's visits; (4) a referral by Dr. Carp to the orthopedic specialist after four to six weeks conformed with the accepted standard of medical care; and (5) Dr. Carp did not breach any standard of medical practice in treating plaintiff. Thus, based on the proofs as a whole, the jury could reasonably find that Dr. Carp did not deviate from accepted standards of medical practice in not making a ruptured Achilles tendon diagnosis and not referring plaintiff to an orthopedic specialist earlier.
Regarding Dr. Mariani, the jury found that Dr. Mariani deviated from the accepted standard of medical practice and that his deviation increased the risk of harm imposed by plaintiff's preexisting condition, but that the increased risk was not a substantial factor in plaintiff's ultimate injury. Evidence in the record regarding the time when a surgical repair becomes less effective supports these findings. The medical experts agreed that as time passes following an orthopedic injury, surgery becomes a less effective treatment modality, frequently making the better treatment course in the late repair period one based on conservative therapy designed to strengthen the affected area. The medical experts disagreed about the division between the late and the early repair periods. While it was Dr. Smith's belief that the early repair period extends from four to eight weeks after the accident, there was also evidence that a reputable school of medical practitioners, including Dr. Balduini who performed the first surgery on plaintiff, is of the opinion that the early repair *581 period terminates around four weeks. Here, Dr. Mariani did not see plaintiff until July 6, 1988, nine weeks after the injury.
Additionally, Dr. John J. McPhilemy was of the opinion that by the time plaintiff consulted Dr. Mariani, her injury had become chronic and could not be treated effectively with surgery. Dr. McPhilemy testified that he does not recommend surgical treatment for patients beyond four weeks. Rather, after that time he favors a more conservative non-operative treatment.
Based on this record in the light of our scope of review, we hold that the trial court properly denied plaintiff's motion for a new trial.

IV.
Accordingly, the order denying plaintiff's motion for judgment notwithstanding the verdict in favor of defendants or, alternatively, a new trial is affirmed.