**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1908-18T2

DR. LEE LICHTENSTEIN,

    Plaintiff-Appellant,

v.

RISA FRANKEL and
MICHAEL FRANKEL,

    Defendants-Respondents.

_____

Submitted June 1, 2020 – Decided July 27, 2020

Before Judges Messano and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-5820-16.

Advokat & Rosenberg, attorneys for appellant (Jeffrey M. Advokat, of counsel and on the briefs).

Marks & Klein, LLP, attorneys for respondents (Steven Todd Keppler, of counsel and on the brief).

PER CURIAM

Plaintiff and his sister, defendant Risa Frankel, were co-executors and equal beneficiaries under the will of their mother, Claire Lichtenstein. Claire died on August 20, 2014, and plaintiff and defendant mutually agreed that defendant would serve as primary executrix of the estate.[1]

Following probate of Claire's will, plaintiff filed suit against his sister and her husband, Michael Frankel (collectively, defendants). Plaintiff's amended complaint claimed that prior to Claire's death, defendants had "unlawfully depleted" the estate, and plaintiff alleged causes of action for conversion, fraud, violation of a power of attorney (POA) Claire had executed in favor of defendant, breach of fiduciary duties, and undue influence. Plaintiff sought compensatory and punitive damages.

The case was tried before a jury. Plaintiff was the sole witness on his behalf; both defendants testified, as did their thirty-two-year-old son, Jason, and thirty-four-year-old daughter, Danielle Bavaro. The jury returned a verdict of no cause of action on all counts except for the claim of undue influence. In response to specific interrogatories, the jury determined that defendant "had a confidential relationship with her mother"; she did not "act[] openly and

---

[1] To avoid confusion, we refer to the decedent and some family members by their first names. We intend no disrespect by this informality.

A-1908-18T2

honestly toward her mother . . . with respect to Claire's financial affairs from 2010 until her death in 2014"; and "Claire . . . [did not understand] how her finances and property were being used between 2010 and her death in 2014[.]" The jury found defendant had unduly influenced her mother and awarded plaintiff $12,000 in compensatory damages and no punitive damages.

Plaintiff moved for a new trial on damages, or, alternatively additur. The judge denied the motion, and this appeal followed.

Plaintiff contends the uncontroverted trial evidence demonstrated that defendant transferred more than $500,000 from Claire's accounts to herself or her family between 2010 and 2014, and the jury award was "clearly and convincingly" a "miscarriage of justice" requiring a new trial or additur. R. 4:49-1. Plaintiff also contends that the jury's finding of undue influence compels the conclusion as a matter of law that all the transfers, claimed by defendant to be inter vivos gifts, are voidable, and he was entitled to an award of damages commensurate with his share, i.e., fifty percent, of the transfers defendant made during that time period.

We have considered the arguments made, in light of the record and applicable legal standards. We affirm.

 A-1908-18T2

We only summarize the trial testimony as necessary to consider plaintiff's arguments.

Plaintiff admitted that his relationship with his mother was strained following a disagreement between the two in 1998 over plaintiff's failure to attend a relative's funeral. Plaintiff had virtually no contact with his mother after 2010 and admittedly lacked any personal knowledge of Claire's mental state or daily activities thereafter.

However, as the other testimony demonstrated, in 2008, the family became concerned about Claire's mental status, and, in 2008 and again in 2009, Claire executed two POAs in favor of defendant. Plaintiff did not know about the POAs until after Claire's death. Although plaintiff failed to introduce any medical evidence regarding Claire's condition, it was undisputed that Claire moved into an assisted living facility in 2010 after being diagnosed with dementia.

In 2011, defendant reported a theft to the local police department. In the report, which was introduced in evidence at trial, defendant said her mother "need[ed] full time care due to the fact that she suffer[ed] from [A]lzheimer's and dementia." However, testimony also revealed that Claire participated in

Danielle's September 2012 wedding, and that as late as September 2013, Claire was able to recognize and interact with Danielle's baby daughter. Justin testified that Claire was able to recognize and communicate with her family until "[p]robably the last few months or so . . . towards the very end."

It was also undisputed that between November 2011 and Claire's death, defendant wrote thirty-nine checks from Claire's bank account, which were made out to "cash" or to members of defendant's family and totaled $90,000. Three checks were written in the days immediately before Claire's death, for $2,000, on August 12, $5,000, on August 15, and $5,000, on August 16.

In addition, in April 2012, $468,919.67 was transferred from Claire's Fidelity Investment account to fund a trust for Danielle and Justin. Defendant testified this was with Claire's knowledge and pursuant to her specific wishes. Defendant testified her mother retained independent legal counsel, who defendant did not know, for the purpose of establishing the trust, and who was paid $5000 for his services. As defendant explained, "my mother did not want my brother to have any money. She didn't want him to be at her funeral. She didn't want him to see her in the hospital. So[,] I was just doing what my mother asked me to do."

A-1908-18T2

Defendant testified that Claire was aware of defendant's financial difficulties and, after discussing the situation, her mother agreed to help. According to defendant, Claire understood and agreed to the disbursements represented by checks made out to defendant and her family. When defendant wrote the final three checks in August 2014, she testified that it had occurred to her that Claire might soon pass away.

## II.

Our review is guided by well-known standards. "A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). In order to "overcome" this "presumption of correctness that attaches to a damages award[,]" the party moving for a new trial or additur must "establish, 'clearly and convincingly,' that the award is 'a miscarriage of justice.'" Ibid. (quoting R. 4:49-1(a)). We review a damages award employing the same standard as the trial court, "with one exception — an appellate court must pay some deference to a trial judge's 'feel of the case.'" Ibid. (quoting Johnson v. Scaccetti, 192 N.J. 256, 282 (2007)).

"[A] court should set aside a jury verdict only if it determines that the award is inadequate or excessive by viewing the evidence in the light most

6                                                                    A-1908-18T2

favorable to the non-moving party." Mahoney v. Podolnick, 168 N.J. 202, 229–30 (2001) (emphasis added) (citing Caldwell v. Haynes, 136 N.J. 422, 432 (1994)). The jury's verdict "must be 'wide of the mark' and pervaded by a sense of 'wrongness[]'" such that it "may be said to shock the judicial conscience." Johnson, 192 N.J. at 281 (quoting Baxter, 74 N.J. at 598–99, 604).

The judicial constructs of additur and remittitur were traditionally viewed as "legitimate mechanisms justified by the desirability of avoiding the expense and delay of a new trial." Tronolone v. Palmer, 224 N.J. Super. 92, 97 (App. Div. 1988) (citing Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 300–31 (1970)). Recently, writing for the Court in Orientale v. Jennings, Justice Albin painstakingly traced the history of both doctrines. 239 N.J. 569, 581–90 (2019). As to additur, Justice Albin explained,

> When the court decides that a grossly inadequate damages award is a miscarriage of justice to the plaintiff, the court has the power to enter an additur, increasing the award to an amount that could be sustained by the evidence, but only the defendant – not the plaintiff – has the choice to accept the increased amount or proceed to a new damages trial.
>
> [Id. at 590 (citing Tronolone, 224 N.J. Super. at 97).]

A-1908-18T2

In Orientale, the Court exercised its "superintendence over the common law and [its] constitutional authority over the practices and procedures of the courts to revise" both doctrines.  Id. at 592.

In doing so, the Court restated the principles that guide consideration of motions for a new trial on damages, and the use of additur and remittitur:

> [T]he trial court may not disturb a damages award entered by a jury unless it is so grossly excessive or so grossly inadequate "that it shocks the judicial conscience."  If a damages award meets that standard, then the court must grant a new trial.  The court also has the option of recommending to the parties a remittitur or an additur in lieu of a new trial.  In setting a remittitur or an additur, the court must determine "the amount that a reasonable jury, properly instructed, would have awarded."  The acceptance of a remittitur or an additur requires the mutual consent of the parties. If either party rejects a remittitur or an additur, the case must proceed to a new trial on damages.
>
> [Id. at 595–96 (citations omitted).][2]

"Undue influence has been described as 'that sort of influence that prevents the person over whom it is exerted "from following the dictates of his own mind and will and accepting instead the domination and influence of

_____

[2] The Court's decision in Orientale was issued after the trial in this case and the denial of plaintiff's motion for a new trial or additur.  Because we conclude plaintiff has failed to meet his burden in demonstrating the jury verdict was a miscarriage of justice, we need not address whether the new standard enunciated in Orientale regarding additur applies.

another."'" In re Estate of DeFrank, 433 N.J. Super. 258, 269 (App. Div. 2013) (quoting Pascale v. Pascale, 113 N.J. 20, 30 (1988)). "In respect of an inter vivos gift, a presumption of undue influence arises when the contestant proves that the donee dominated the will of the donor, or when a confidential relationship exists between donor and donee[.]" Pascale, 113 N.J. at 30 (citations omitted).

> When the presumption of undue influence arises from an inter vivos gift, the donee has the burden of showing by clear and convincing evidence not only that "no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood."
>
> [Id. at 31 (quoting In re Dodge, 50 N.J. 192, 227 (1967)).]

Here, the jury concluded that defendant had exerted undue influence over her mother regarding the inter vivos transfers of Claire's assets. In denying plaintiff's new trial motion, the judge observed that the damage award could have reflected the jury's conclusion that defendant's undue influence did not arise until fairly late in Claire's life. He noted that $12,000 equaled the amount of the last three checks defendant wrote immediately prior to Claire's death.

We acknowledge that the interrogatories submitted to the jury, apparently drafted by defense counsel, utilized a much broader timeframe, in one instance,

"from" 2010 to 2014, and in another, "between" 2010 and 2014. The jury was never asked to determine if it found defendant exerted undue influence over her mother, when did it begin. Plaintiff had no objection to the charge or the interrogatories and asserts no challenge to them on appeal.

Plaintiff's argument assumes that the jury's answers to the interrogatories means that the jury concluded defendant's undue influence began much earlier than a few days before Claire's death. He notes the undisputed fact that Claire was diagnosed with dementia in 2010. However, plaintiff concededly knew nothing of his mother's mental status in her waning years because he had no contact with her whatsoever. Plaintiff never produced expert medical evidence that equated a 2010 diagnosis of dementia when Claire entered the assisted living facility to her inability to understand her finances or instruct defendant to make disbursements consistent with defendant's testimony at trial. In fact, there was overwhelming evidence to the contrary, which, if believed, supported defendant's claim there was no deception, no undue influence used, and that Claire understood the gifts she bestowed on defendant and her family and did so voluntarily. See Pascale, 113 N.J. at 31. The judge properly instructed the jury on the shifting burden of proof in this regard, and plaintiff does not contend otherwise.

Defendant's family members, who had personal knowledge of Claire's mental state up to the time of her death, testified about specific events demonstrating Claire was fully capable of understanding her financial circumstances and expressed a desire to help defendant and her children. However, the situation changed toward the end of Claire's life. Jason, and to some extent, defendant herself, acknowledged this before the jury.

As noted, both the trial court in deciding the motion for a new trial on damages, and now this court on appeal, must view the evidence in a light most favorable to defendant as the non-moving party. Mahoney, 168 N.J. at 229–30. As part of our review, we must consider if "sufficient credible evidence in the record as a whole supported all aspects of the jury's verdict." Kozma v. Starbucks Coffee Co., 412 N.J. Super. 319, 326 (App. Div. 2010) (citing Crego v. Carp, 295 N.J. Super. 565, 578 (App. Div. 1996)). "[N]either a trial judge nor an appellate court may reweigh the evidence and impose a new verdict simply because they disagree with the jury's decision." Crego, 295 N.J. Super. at 578 (App. Div. 1996).

We conclude the trial judge properly denied plaintiff's motion for a new trial. Plaintiff has failed to establish by clear and convincing evidence that the jury award in this case resulted in a miscarriage of justice. R. 4:49-1(a).

11

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1908-18T2